838 A.2d 740

COMMONWEALTH of Pennsylvania, Appellant,

v.

Mark BOWDEN and Linn Washington, Jr., Appellees.

Commonwealth of Pennsylvania,

v.

Brian Tyson,

Appeal of Mark Bowden and Linn Washington, Jr.

Supreme Court of Pennsylvania.

Argued April 7, 2003.

Decided Dec. 19, 2003.

152

Hugh J. Burns, Ronald Eisenberg, Karen A. Brancheau, Philadelphia, for Com.

Benjamin Charles Dunlap, Jr., Craig J. Staudenmaier, Harrisburg, amicus curiae, for Pennsylvania Association of Broadcasters.

Teri L. Henning, amicus curiae, for Pennsylvania Newspaper Association.

Robert C. Clothier, Robert C. Heim, Amy B. Ginensky, for Mark Bowden.

Simone White, Ronald A. White, Philadelphia, for Linn Washington, Jr.

Before CAPPY, C.J., and CASTILLE, NIGRO, NEWMAN, SAYLOR, EAKIN and LAMB, JJ.

## OPINION OF THE COURT

Justice NIGRO.

This appeal concerns the scope of the Pennsylvania Shield Law, 42 Pa.C.S. § 5942, the reach of the qualified reporters' privilege to refuse to disclose sources and materials, and the propriety of a contempt sanction imposed on two reporters for refusing to provide prosecutors with statements made by a criminal defendant while being interviewed prior to his trial.

### I

During a protracted feud with local drug dealers in his North Philadelphia neighborhood, Brian Tyson shot and killed

one dealer, a twenty-three year-old named Damon Millner. Tyson readily admitted to the slaying, but at some point claimed that he had acted in self-defense. Later, before his trial for killing Millner, Tyson contacted *Philadelphia Inquirer* staff writer Mark Bowden and spoke with him on several occasions, providing Bowden with details of the shooting and of his clash with the dealers. Based on this information, Bowden authored a series of three articles for the *Inquirer* in which he explained the Commonwealth's likely theory of vigilantism and Tyson's claim of self-defense. *See generally* Mark Bowden, *Hero or Vigilante? A Man's Fight for His Neighborhood*, PHILA. INQUIRER, June 21, 1998, at A01; Mark Bowden, *A Frustrating Search for Help*, PHILA. INQUIRER, June 22, 1998, at A01; Mark Bowden, *A War of Nerves Erupts in Gunfire*, PHILA. INQUIRER, June 23, 1998, at A01. After reading these articles, *Philadelphia Tribune* investigative journalist Linn Washington, Jr. also spoke with Tyson on numerous occasions and collected information about his case. Ultimately, Washington authored several editorial pieces for the *Tribune* discussing Tyson, *see generally* Linn Washington, Jr., *City Man Trapped in 'Twilight Zone' After Shooting*, PHILA. TRIB., July 28, 1998, at 2A; Linn Washington, Jr., *Mystery of Shotgun Magnifies a Murder Case*, PHILA. TRIB., Sept. 15, 1998, at 2A; Linn Washington, Jr., *If DA Calls on Thugs, Who Can Get Justice?*, PHILA. TRIB., Aug. 3, 1999, at 2A; Linn Washington, Jr., *Thomas Jones is Not Only Victim of Police Abuses*, PHILA. TRIB., July 25, 2000, at 7A; Linn Washington, Jr., *One Black Family that Badly Needs Saving*, PHILA. TRIB., Oct. 10, 2000, at 7A, and also authored an article about the Tyson case on a freelance basis for the *Philadelphia Weekly*, *see* Linn Washington, Jr., *Vigilante or Victim?*, PHILA. WEEKLY, Sept. 8, 1999, at 9.

Commonwealth prosecutors apparently found that certain portions of these newspaper pieces were inconsistent with statements Tyson had made to authorities. As a result, on October 24, 2000, the Commonwealth directed subpoenas to both Bowden and Washington, instructing them to appear on November 30, 2000, the day before Tyson's trial was scheduled

to begin, and produce to the Commonwealth "all handwritten or otherwise memorialized notes of interviews or phone conversations with Brian Tyson and or [sic] Maya Scarpitti." [1] R.R. 14a, 15a. Bowden and Washington moved to quash the subpoenas on November 29, 2000, arguing that their unpublished notes were protected from disclosure by the Pennsylvania Shield Law and a qualified privilege arising out of the First Amendment to the United States Constitution.

The trial court heard oral argument on the reporters' motions on December 1, 2000, and then began jury selection for Tyson's trial. As jury selection was proceeding, the trial court entered an order on December 4, 2000, granting the reporters' motions in part and denying them in part. Specifically, the court found that the Pennsylvania Shield Law, as interpreted by this Court in *In re Taylor*, 412 Pa. 32, 193 A.2d 181 (1963), did not protect the reporters' notes from production because such protection is afforded only where "the documents sought might reveal confidential sources." *Commonwealth v. Tyson*, No. 14, Oct. Term 1997, slip op. at 1 (Com.Pl.Phila.Dec.4, 2000). The court did recognize, however, that a qualified First Amendment privilege, derived from *Branzburg v. Hayes*, 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972), provided a limited degree of protection to the confidentiality of the reporters' notes. *Id.* at 1, 3. Nevertheless, the trial court determined that this qualified privilege did not prevent the compelled disclosure of "verbatim or substantially verbatim statements of [Tyson] involving the incident itself or such statements of [Tyson] which speak to his relationship to drug dealers in [his] neighborhood." [2] *Id.* at 3. In this regard, the court reasoned:

Because only the reporter and [Tyson] were privy to the conversations, these statements would not be obtainable from any other source. Indeed, in view of [Tyson's] [F]ifth

1. The Commonwealth eventually abandoned its pursuit of the reporters' notes that pertain to Scarpitti, who is Tyson's wife.

2. It appears that the trial court derived the phrase "verbatim or substantially verbatim statements" from *United States v. Cuthbertson*, 630 F.2d 139, 143 (3d Cir.1980), a case discussing the meaning of *Branzburg*. *See infra* part II–B.

[A]mendment privilege, the Commonwealth may not simply interview him, as it might with other witnesses. Certainly the statements are relevant and necessary, possibly in the Commonwealth's case in chief, but also for impeachment or rebuttal if [Tyson] decides to present a defense. For these are the statements of [Tyson] and go directly to his guilt or to impeach his defense that the killing was justified....

*Id.*

Bowden and Washington immediately moved the trial court for a stay of its order, but the court denied that motion from the bench on December 5, 2000. The court then commenced Tyson's trial, first issuing preliminary instructions to the jury and then allowing attorneys for the Commonwealth and Tyson to present their opening statements. Meanwhile, the reporters were seeking a stay of the trial court's order from the Superior Court, which issued a temporary stay on December 6, 2000 pending the Commonwealth's response to the reporters' motion. The trial court, having received word of the Superior Court's stay order, halted Tyson's trial.[3] The following day, the Superior Court entered an order dissolving the temporary stay effective December 8, 2000. Tyson's trial then resumed, with the trial court proceeding to swear the jury and the Commonwealth presenting several of its witnesses as part of its case-in-chief. At the same time, Bowden and Washington were once again seeking a stay, this time from this Court. We issued a temporary stay order on December 11, 2000, but ultimately denied the reporters' request on December 12, 2000. By that point, the Commonwealth had completed its case-in-chief and Tyson's defense case was in progress.

Following this Court's denial of the reporters' request for a stay, the trial court held a mid-trial hearing on the morning of December 13, 2000, at which time the Commonwealth again requested that Tyson's statements be produced. As Bowden and Washington had exhausted all avenues of relief with

---

**3.** The trial court temporarily stopped Tyson's trial due to the vagueness of the Superior Court's stay order. Ultimately, however, the trial court determined that the Superior Court's stay order did not pertain to the trial itself, but rather applied only to the trial court's directive that Bowden and Washington produce Tyson's statements.

regard to a stay of the trial court's order, the court directed the reporters to comply with its December 4, 2000 order by 12:00 p.m. on the day of the hearing or be held in contempt of court. The court reiterated that Bowden and Washington could comply with the court's edict by producing the subject statements either orally or in writing, and thus could avoid having to provide the Commonwealth with their actual notes.

Bowden and Washington declined to comply with the trial court's order by the stated deadline and thus were held in contempt. Specifically, the trial court entered what it characterized as a coercive civil contempt citation: an order that "each [reporter] must pay $100 per minute starting 12:00 noon this date until compliance or until the Commonwealth finally rests its case on rebuttal [of Tyson's defense]." *Commonwealth v. Tyson*, No. 14, Oct. Term 1997 (Com.Pl.Phila.Dec.13, 2000). The Commonwealth completed its rebuttal the following day, December 14, 2000, and the jury subsequently found Tyson guilty of third-degree murder. Thereafter, the court advised Bowden and Tyson that 400 minutes of trial were covered by the contempt order, and, accordingly, that each reporter's sanction totaled $40,000.

Bowden and Washington appealed to the Superior Court, which affirmed in part and remanded in part. *Commonwealth v. Tyson*, 800 A.2d 327 (Pa.Super.2002). The court found that the trial court had correctly interpreted the Pennsylvania Shield Law, explaining that our post-*Taylor* decision in *Hatchard v. Westinghouse Broadcasting Co.*, 516 Pa. 184, 532 A.2d 346 (1987), had interpreted the Shield Law as protecting only the confidentiality of a source's identity. *Tyson*, 800 A.2d at 333. As Tyson had discussed only his own actions with Bowden and Washington, the court reasoned that there was no danger that disclosure of [Tyson's] unpublished statements would reveal any confidential informants. *Id.* Thus, the court concluded that the Shield Law did not protect Tyson's statements to the reporters from compelled disclosure. *Id.* at 333–34.

With respect to the reporters' qualified privilege claim, the court concluded that the Commonwealth had satisfied its

burden of proving (1) that it had exhausted attempts to obtain the information from other sources, (2) that the information sought was "material[,] relevant[,] and necessary," and (3) that the information sought was "crucial" to its case. *See id.* at 331–32 (citing *Davis v. Glanton,* 705 A.2d 879, 885 (Pa.Super.1997)). Specifically, the court reasoned that the Commonwealth could not obtain Tyson's statements from any source other than the reporters because only Tyson and the reporters were present at each interview, because the Commonwealth could not directly compel Tyson to produce the statements, and because Tyson would either not reveal the statements or not reveal them in an accurate manner on cross-examination. *Id.* at 332. In addition, the court found that the Commonwealth had demonstrated that Tyson's statements were relevant because Tyson had claimed self-defense, making his statements about the shooting "directly relevant and crucial to countering his self-defense theory and impeaching his credibility." *Id.* The court similarly concluded that Tyson's statements were crucial to the Commonwealth's case and its effort to counter Tyson's defense because such statements would help the Commonwealth prove that [Tyson] shot the victim deliberately to help rid his neighborhood of drugs and gangs, rather than in self-defense. *Id.* at 332–33.

In spite of its agreement with the trial court's Shield Law and qualified privilege findings, the Superior Court nevertheless found that the contempt sanction it imposed was "harsh and excessive. *Id.* at 335. The Superior Court acknowledged that a trial court has discretion to impose sanctions to vindicate its orders and authority, yet the court determined that the trial court's steep sanction was unprecedented and shocking, especially given that the sanction had accumulated during less than seven hours of trial. *Id.* Accordingly, the Superior Court remanded the matter to the trial court for a determination of a more appropriate sanction. *Id.*

Judge Stevens dissented from the majority's analysis and conclusions pertaining to the Shield Law and qualified privilege. *See generally id.* at 335–36 (Stevens, J., dissenting). Specifically, he found that *Taylor,* not *Hatchard,* should have

been applied to the Shield Law analysis of this case, as *Taylor* and the instant case involved criminal proceedings, whereas *Hatchard* was a defamation case. *Id.* at 336. Judge Stevens contended that the Superior Court was therefore bound to follow this Court's construction of the Shield Law in *Taylor,* arguing that it required absolute protection of the content of the reporters' notes. *Id.* With respect to the reporters' qualified privilege claim, Judge Stevens reasoned that the Commonwealth had failed to demonstrate that Tyson's statements were crucial to its case and thus had not met its burden. *Id.* at 335–36.

Bowden and Washington sought allowance of appeal, challenging the propriety of the Superior Court's Shield Law and qualified privilege findings. The Commonwealth cross-petitioned, contending that the Superior Court should not have vacated the trial court's contempt sanction. We granted the parties' petitions, *Commonwealth v. Bowden,* 572 Pa. 695, 813 A.2d 835 (2002); *Commonwealth v. Tyson,* 572 Pa. 704, 813 A.2d 841 (2002), and now affirm.

## II

### A

Bowden and Washington first contest the construction applied to the Pennsylvania Shield Law by the courts below. The Shield Law provides:

### § 5942. Confidential communications to news reporters

(a) **General Rule.**—No person engaged on, connected with, or employed by any newspaper of general circulation or any press association or any radio or television station, or any magazine of general circulation, for the purpose of gathering, procuring, compiling, editing or publishing news, shall be required to disclose the source of any information procured or obtained by such person, in any legal proceeding, trial or investigation before any government unit.

42 Pa.C.S. § 5942(a) (boldface in original).[4] Bowden and Washington contend that this statute, enacted by the General Assembly to protect reporters from the threat of subpoena, provides an absolute privilege that shelters reporters from compelled disclosure of their unpublished materials. In support of this contention, they rely on this Court's decision in *In re Taylor*, 412 Pa. 32, 193 A.2d 181 (1963), asserting that it interprets the Shield Law as protecting reporters' unpublished information from disclosure regardless of the confidentiality of any human sources. The reporters also aver that the *Taylor* decision has been incorporated into the Shield Law itself, as the General Assembly twice re-enacted the Shield Law following *Taylor*. *See infra* note 5. Furthermore, Bowden and Washington acknowledge this Court's decision in *Hatchard v. Westinghouse Broadcasting Co.*, 516 Pa. 184, 532 A.2d 346 (1987), but maintain that it only applies in cases where application of the *Taylor* archetype would thwart a claim of defamation. Thus, applying *Taylor*, the reporters contend that the absolute privilege provided by the Shield Law protected their unpublished materials from disclosure. We disagree.

In *Taylor*, a grand jury was convened to investigate allegations of corruption involving various branches of the Philadelphia city government. 193 A.2d at 182. Thereafter, the *Philadelphia Evening Bulletin* published an article in which it reported that the Philadelphia District Attorney's office had interrogated former city official John J. Fitzpatrick, who was under investigation by the grand jury. *Id.* Among other things, the *Bulletin* article stated that the District Attorney's office had asked Fitzpatrick certain questions regarding prior statements he had made in interviews with *Bulletin* reporters. *Id.* This statement in the article prompted the service of a grand jury subpoena on the *Bulletin*'s Robert L. Taylor and Earl Selby for production of all documents that pertained to the *Bulletin*'s interviews with Fitzpatrick. *Id.* Taylor and Selby appeared before the grand jury, but refused to answer

4. Subsection (b) of section 5942, not applicable here, provides that the general rule in subsection (a) does not apply where a radio or television station has failed to maintain some type of recording of the relevant broadcast for at least one year. *See* 42 Pa.C.S. § 5942(b).

certain questions, citing the Shield Law.[5] *Id.* at 182–83. Based on this refusal, Taylor and Selby were brought before the trial court, which held them in contempt after they again refused to answer questions that the court had deemed permissible. *Id.* at 183. In doing so, the trial court reasoned that the Shield Law protects reporters from compelled disclosure of personal identities, not documents or other inanimate objects. *Id.* Thus, the court concluded that Taylor and Selby were not required to produce documents that could lead to the identification of any confidential sources. *Id.* Nevertheless, it did find that Taylor and Selby were obligated to testify about, and produce documents relating to, statements Fitzpatrick had made to *Bulletin* reporters, explaining that the *Bulletin* had waived the Shield Law privilege by stating in the article that the District Attorney's office had questioned Fitzpatrick about his contact with *Bulletin* reporters. *Id.* To protect the identity of any confidential human sources, however, the court directed Taylor and Selby to provide the documents with all names deleted. *Id.* at 186.

On appeal, this Court reversed the trial court order holding Taylor and Selby in contempt. As an initial matter, the Court focused its inquiry on the terms of the Shield Law, which it considered clear. *Id.* at 184. In particular, the Court explained that the term source of information includes documents as well as personal informants, and also reasoned that '[s]ource' means not only the identity of the person, but likewise includes documents, inanimate objects and all sources of information. *Id.* at 184–85 (emphases omitted). Moreover, the Court stated that any doubts in construing the Shield Law had to be construed in favor of the *Bulletin* due to the

5. At that time, an earlier version of the Shield Law was in effect, although it was identical in all material respects to the current version of the Law. *See* Act of June 25, 1937, P.L. 2123, No. 433, 1 (formerly codified at 28 P.S. 330); Act of Dec. 1, 1959, P.L. 1669, 1 (same). Following *Taylor*, the General Assembly reenacted the Shield Law with minor modifications not at issue here. *See* Act of July 31, 1968, P.L. 858, No. 255, 1. Finally, in 1976, the legislature once again reenacted the Shield Law, at that time codifying it as part of the Judicial Code. *See* Act of July 9, 1976, P.L. 586, No. 142, 2 (codified at 42 Pa.C.S. 5942); Act of April 28, 1978, P.L. 202, § 2(a) (repealing former 28 P.S. § 330).

interests underlying the Shield Law—specifically, the need to shelter members of the media from subpoenas in order to preserve their role as the principal watch-dogs and protectors of honest, as well as good, Government. *Id.* at 185. Similarly, the Court found that the General Assembly, in enacting the Shield Law, had placed greater emphasis on the public interest in an unfettered press than on disclosure of alleged crimes through subpoenas directed to the media. *Id.* at 185–86. Importantly for instant purposes, this Court also explained that the Shield Law must be interpreted to apply to documents because:

> If the [Shield Law] applies only to persons and does not include documents, then logically [Taylor and Selby] would have to disclose and produce all documents in their possession. However, [the trial court] in an attempt to fairly (although erroneously) limit the source of information to persons as distinguished from documents, ruled that [Taylor and Selby] were required to produce only the documents . . . allegedly evidencing what Fitzpatrick had told reporters with all names deleted. *No one could know with certainty whether the documents as deleted by the newsman would still reveal sources of information which the [Shield Law] intended to protect.* [The trial court] based [its] ruling principally if not solely on [its] conclusion that the *Bulletin* had waived the privilege created by the [Shield Law] by publishing in its aforesaid article [the statement that certain questioning by the District Attorney's Office implicated statements Fitzpatrick had made to *Bulletin* reporters]. This obviously gave Fitzpatrick as the leading source, *but the identity of many other persons may have been revealed in the questions and/or the answers.*

*Id.* at 186 (emphases omitted and added; footnote omitted). Finally, the Court concluded that the trial court had incorrectly applied the waiver doctrine, because the doctrine only applies to statements actually published by the relevant media outlet. *Id.* at 186.

While Bowden and Washington rely heavily on *Taylor* in support of their assertion that the Shield Law protects Ty-

son's statements from disclosure, the facts of *Taylor* are readily distinguishable from the instant case and, as a result, *Taylor*'s holding does not control here. As indicated above, *Taylor* involved a grand jury convened to probe allegations of widespread governmental corruption. *Id.* at 182. Allegations of conspiracy, solicitation, bribery, and other crimes reached both the legislative and executive branches of the Philadelphia city government, including the Zoning Board of Adjustment and the Department of Licenses and Inspections, and such allegations also extended to members of the City Committee of the Democratic Party. *Id.* Under such circumstances, Fitzpatrick likely identified numerous secondary sources for his knowledge regarding this widespread corruption, and all documents relating to Fitzpatrick's contacts with the *Bulletin,* even if every name had been redacted, had the potential to reveal sources of information which the [Shield Law] intended to protect. *Id.* at 186. As the *Taylor* court explained, the identity of many other persons may have been revealed, by insinuation, via the questions posed by Fitzpatrick's interrogator and the answers he rendered.[6] *Id.* Thus, given the special

6. It is this vital aspect of *Taylor* that leads us to reject the reporters' contention that it should be read as interpreting the Shield Law as protecting non-confidential sources in addition to confidential sources. Moreover, our reading of *Taylor* is consistent with the statute itself, as it states that no person in a newsgathering enterprise shall be required to *disclose* the source of any information procured or obtained, 42 Pa.C.S. § 5942(a) (emphasis added), which plainly presupposes a confidential source. *See* BLACK's LAW DICTIONARY 477 (7th ed.1999) (defining "disclosure" in part as "[t]he act or process of making known something that was previously unknown"); *see also* AMERICAN HERITAGE DICTIONARY 375 (1969) (defining "disclose" in part as "[t]o make known; divulge"). We also find it significant that the statute is entitled *"Confidential communications to news reporters,"* 42 Pa.C.S. § 5942 (emphasis added; boldface in original), which indicates that only *confidential* communications are protected by the Shield Law. *See* 1 Pa.C.S. § 1924 ("The title ... of a statute may be considered in the construction thereof."); Malcolm J. Gross, *Subpoenas and Newsrooms—The Impact of Pennsylvania's New Reporter's Privilege and Newly—Interpreted Shield Law,* 65 PA. B. Ass'N. Q. 51, 53 n. 26 (1994) ("Neither Pennsylvania's first Shield Law [n]or any revisions contained 'confidential' in their captions. However, when the Legislature [re]codified the Shield Law in 1976, the caption that previously had been carried by Purdon's, specifically, 'Confidential [c]ommunications to [n]ews [r]eporters,' apparently became part of the law."); *see also McMenamin v. Tartaglione,*

set of facts upon which *Taylor* turned, we read that case as standing only for the proposition that documents are to be considered sources where their production, even with all names redacted, could breach the confidentiality of a human source.[7] *Id.; see also In re "B"*, 482 Pa. 471, 394 A.2d 419, 429 (1978) (Roberts, J., concurring) ("We held in [*Taylor*] that where a newsman's source is protected under the statute, so, too, are all *documents and records which would tend to disclose that source.* (emphasis added)); *cf. Hepps v. Phila. Newspapers, Inc.*, 506 Pa. 304, 485 A.2d 374, 386–87 (1984) (citing *Taylor* for the proposition that the Shield Law permits documentary sources to be withheld because "the identity of all persons named *or implicated* in these sources is also included within the protection of the [Shield Law]" (emphasis added)), *rev'd on other grounds*, 475 U.S. 767, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986).

Significantly, in the instant case, there is no risk that the statements at issue will reveal the identities of any confidential human sources. This is so because, in marked contrast to *Taylor*, this case involves discussions between just three individuals: Bowden, Washington, and Tyson. Moreover, only Tyson's statements about his individual actions on the night of the shooting and his relationship with local drug dealers are subject to the trial court's order. Put simply, Tyson made the

139 Pa.Cmwlth. 269, 590 A.2d 802, 811 (1991) (stating that Shield Law "clearly applies to a reporter protecting his 'confidential sources'), *aff'd per curiam*, 527 Pa. 286, 590 A.2d 753 (1991).

7. This admittedly narrow reading of *Taylor* is entirely consistent with the plain text of the Shield Law, and largely deflates certain criticisms that met the decision following its announcement. *See, e.g.,* Recent Case, *Evidence—Privileged Communications—Journalist Need Not Reveal Information Disclosed by Confidential Informant—In the Matter of Taylor (Pa.1963)*, 77 HARV. L.REV. 556, 557 (1964) ("The [*Taylor*] court's analysis ... blurs the distinction between the meaning of 'source' and of 'information' in the present context.); Case Comment, *Newspapermen Not Required to Divulge Confidential Information to Investigating Grand Jury Even After Informant's Identity Has Been Voluntarily Disclosed in Newspaper Article*, 112 U. PA. L.REV. 438, 441 (1964) (If the legislature intended to include the information itself, it could have used 'information,' as it did in the statute creating the physician-patient privilege, or the words 'confidential communication,' as it did in the attorney-client privilege statute. (footnotes omitted)).

subject statements to Bowden and Washington, his identity is not confidential, and there is no indication or allegation in this case that the identities of other individuals from whom Tyson may have obtained information will be revealed if Tyson's statements are disclosed. Therefore, unlike *Taylor*, there is no indication here that the identity of . . . other persons may [be] revealed through exposure of Tyson's statements.[8] *Taylor*, 193 A.2d at 186; *see Tyson*, 800 A.2d at 333 ("[Tyson] only spoke to the reporters about his own actions, and therefore, there is also no danger that disclosure of his unpublished statements would reveal any confidential informants.). Accordingly, based on an appropriate reading of *Taylor*, we conclude that the Shield Law does not afford a complete defense to disclosure of Tyson's statements.

In addition to *Taylor*'s patent dissimilarity to the instant case, any broader interpretation of the Shield Law that could be gleaned from that case has been rejected by subsequent decisions of this Court.[9] *Cf. Davis v. Glanton*, 705 A.2d 879, 884 (Pa.Super.1997) (explaining that newspaper's argument might be persuasive if *In re Taylor* were the final statement of our supreme court on the interpretation and application of the Shield Law.). In our 1987 decision in *Hatchard*, for example, we were confronted with the question of whether the use of the term 'source' in the context of the [Shield Law] reflects a legislative intention to protect *all* documentary information from discovery by a plaintiff in a defamation

**8.** Additionally, even if the reporters' notes could be considered "sources" under *Taylor*, we find it significant that the trial court did not require their actual notes to be furnished to the Commonwealth. Rather, as the trial court repeatedly emphasized, it commanded Bowden and Washington to produce Tyson's statements—the content *derived* from the reporters' notes—either orally or in writing.

**9.** It is for this reason that we are not persuaded by the reporters' reliance on federal decisions interpreting the Shield Law after *Taylor* but before our post-*Taylor* cases. *See, e.g., Coughlin v. Westinghouse Broad. & Cable Inc.*, 780 F.2d 340, 343–44, 347 (3d Cir.1985) (Becker, J., concurring); *Lal v. CBS, Inc.*, 726 F.2d 97, 100–01 (3d Cir.1984); *Steaks Unlimited, Inc. v. Deaner*, 623 F.2d 264, 277–79 (3d Cir.1980). Similarly, our post-*Taylor* decisions detract significantly from the force of the reporters' argument that the General Assembly has adopted a broad reading of *Taylor* by re-enacting the Shield Law after that decision was rendered.

action, regardless of whether the documentary information could reveal a confidential media-informant. 532 A.2d at 348 (emphasis in original). In reaching the conclusion that the Shield Law did not reflect such an intention, we reasoned that the *Taylor* decision, when applied in conjunction with recent developments in constitutional law relating to defamation, would effectively and improperly preclude a plaintiff's defamation action against a media defendant. *Id.* at 348–49, 350–51. Moreover, we relied on the purpose of the Shield Law to determine its scope:

> The obvious purpose of the Shield Law is to maintain a free flow of information to members of the news media. We fail to see how this purpose is promoted by protecting from discovery documentary information that was in the possession of the publisher of the defamatory statement where disclosure of this information would not reveal the identity of a confidential media-informant. While there may be some who would only share information with the media if the media enjoyed an absolute shield from any discovery in civil proceedings, providing an absolute shield could hardly be said to be necessary to effectuate the purpose of the Shield Law in light of the information that flows freely in states that have enacted more carefully-tailored shield laws and the considerable burden of proof imposed on a defamation plaintiff by the requirements of the First Amendment. We see no apparent reason why the objective of promoting the free flow of information to the media would be defeated so long as any documentary information that could lead to the discovery of the identity of a confidential informant is shielded from disclosure.

*Id.* at 350 (citation omitted). We then took this logic one step further, stating that to the extent that language in *In re Taylor* may be read as interpreting the Shield Law to protect from discovery, in defamation actions, documentary material that could not reasonably lead to the discovery of the identity of a confidential media-informant, that decision interpreted the Shield Law much too broadly. *Id.* at 351. Accordingly, we concluded that unpublished documentary information gathered

by a television station is discoverable by a plaintiff in a libel action to the extent that the documentary information does not reveal the identity of a personal source of information or may be redacted to eliminate the revelation of a personal source of information. *Id.; see also Davis,* 705 A.2d at 882, 885 (interpreting *Hatchard* as permitting disclosure of all material pertaining to conversations with disclosed sources as long as the material cannot reasonably lead to the discovery of the identity of another, undisclosed source, or can be redacted to prevent such revelation); *Pa. Bar Ass'n v. Commonwealth,* 147 Pa.Cmwlth. 351, 607 A.2d 850, 855 n. 6 (1992) (noting that *Hatchard* court held that Shield Law could not be interpreted to shield information that could not possibly lead to discovery of the identity of the confidential source).

The following year, in *Sprague v. Walter,* 518 Pa. 425, 543 A.2d 1078 (1988), we confronted the question of whether, in the context of a defamation case, invocation of the Shield Law carried with it a concomitant inference of the reliability of the information provided by the confidential source. In answering that question in the negative, we pointed out that [t]he language of our Shield Law reflects [its] purpose by protecting the media against the forced disclosure of the identity of its sources. *Id.* at 1083. Importantly, we also discussed the relationship between *Taylor* and *Hatchard:*

> In attempting to justify its adoption of an expansive reading of our Shield Law provision, the Superior Court relied heavily upon the language appearing in our decision in *In re Taylor* .... However, we subsequently ... modified the expansive interpretation of the Shield Law as set forth in *Taylor. Hatchard v. Westinghouse Broadcasting Co.,* 516 Pa. 184, 532 A.2d 346 (1987). We adhere to that modified view today in holding that the privilege provided under the Shield Law was not intended to allow a media defendant to use any of its sources and information as proof of verification or evidence of responsibility when it opts to rely upon the privilege.

*Id.* (emphasis omitted). We therefore held that no inference regarding the reliability or accuracy of information provided

by an unidentified source could be drawn from invocation of the Shield Law. *Id.* at 1086.

Although we are cognizant that *Hatchard* and *Sprague* were defamation cases, and *Hatchard*'s modification of *Taylor,* as acknowledged in *Sprague,* was undoubtedly provoked by the constitutional conflict identified in that case, we nevertheless see no principled reason why the interpretation of the Shield Law espoused in those cases should not apply in other settings such as this one. To begin with, the statute itself does not indicate that its terms should be interpreted differently in various settings. *Cf. Mishoe v. Erie Ins. Co.,* 573 Pa. 267, 824 A.2d 1153, 1159 n. 8 (2003) (rejecting contention that statutory language should be read as having differing meanings where no indication that legislature intended to use language "as some sort of verbal chameleon"). Indeed, courts in this Commonwealth have already applied *Hatchard* and *Sprague* outside of the defamation setting, and thus have recognized that the Shield Law's text should be read with a single, fixed meaning. *See, e.g., Commonwealth v. Linderman,* 17 Pa. D. & C. 4th 102, 106–07 (Com. Pl. Chester 1992) (criminal case where Commonwealth attempted to subpoena crime scene photos taken by newspaper photographer; court applies *Hatchard* and *Sprague* instead of *Taylor* in rejecting newspaper's claim that photos were "sources"); *Shetler v. Zeger,* 4 Pa. D. & C. 4th 564, 570–73 (Com. Pl. Franklin 1989) (personal injury case where plaintiff attempted to subpoena vehicular accident scene photos taken by newspaper photographer; court finds that "[a]lthough *Hatchard* was decided in the context of a libel action, this court believes its reasoning has equal application to the case at bar"; court consequently denies newspaper's petition for a protective order). Moreover, *Hatchard*'s construction of the Shield Law to protect the free flow of information to the media, while preserving access to certain media materials, applies with equal force outside of the defamation setting. *See Hatchard,* 532 A.2d at 350 (We see no apparent reason why the objective of promoting the free flow of information to the media would be defeated so long as any documentary information that could lead to the

discovery of the identity of a confidential informant is shielded from disclosure.). Accordingly, we find that the *Hatchard* interpretation of the Shield Law, consistent with our reading of *Taylor*, applies to this case, and, as a result, we conclude that the Shield Law does not protect Tyson's statements to Bowden and Washington from compelled disclosure.

In conclusion, we construe *Taylor*, as interpreted by *Hatchard* and *Sprague*, as standing for the proposition that documents may be considered sources for Shield Law purposes, but only where production of such documents, even if redacted, could breach the confidentiality of the identity of a human source and thereby threaten the free flow of information from confidential informants to the media. *See Davis*, 705 A.2d at 882, 885. In the instant case, as stated above, it was Tyson who spoke to Bowden and Washington, and he did not provide any information to them on a confidential basis, but rather knew that his statements could be disclosed in their articles. *See Tyson*, 800 A.2d at 333. Moreover, there is no indication or allegation that his statements to the reporters revealed the identities of any secondary confidential sources. Accordingly, disclosure here would not inhibit the free flow of information to the media through the revelation of any confidential human sources, and, therefore, the Shield Law does not prevent the compelled disclosure of Tyson's statements.

## B

The other contention raised by Bowden and Washington is that the lower courts misapplied the qualified reporters' privilege rooted in the United States Supreme Court decision in *Branzburg v. Hayes*, 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972). Although the ultimate holding of *Branzburg* was that requiring reporters to appear and testify before state or federal grand juries does not violate the First Amendment freedoms of speech and press, *id.* at 667, 92 S.Ct. 2646, the United States Court of Appeals for the Third Circuit has indicated that a majority of the Supreme Court justices who participated in the five-to-four *Branzburg* decision actually

supported some quantum of privilege for reporters. As such, the Third Circuit has concluded that reporters have a qualified right to refuse to disclose their sources and materials. *See Riley v. City of Chester*, 612 F.2d 708 (3d Cir.1979) (privilege recognized and applied in civil case where plaintiff sought identity of confidential source from news reporter); *United States v. Cuthbertson*, 630 F.2d 139 (3d Cir.1980) (*"Cuthbertson I"*) (extending privilege recognized in *Riley* to criminal case and to documents where defendants sought notes of interviews with non-confidential sources); *United States v. Criden*, 633 F.2d 346 (3d Cir.1980) (applying *Riley* and *Cuthbertson I* in criminal case where defendant sought verification from reporter of conversation with witness who had previously testified that the conversation occurred);[10] *see also Titan Sports, Inc. v. Turner Broad. Sys. (In re Madden)*, 151 F.3d 125, 128 (3d Cir.1998) ("[W]e have recognized that when a

10. Parenthetically, we note that the Commonwealth urges us to reject these three Third Circuit cases and construe *Branzburg* as not providing Bowden and Washington with any privilege whatsoever. We decline this invitation for several reasons. First, the Commonwealth did not make this argument to the trial court. Indeed, before the trial court, the parties' confined their dispute to the proper interpretation of these Third Circuit cases. Moreover, because we ultimately conclude that the Commonwealth has made a showing sufficient to surmount the qualified privilege as recognized by the Third Circuit, *see infra* pp. 755–59, we need not reach the broader, thornier question of whether the Third Circuit properly interpreted *Branzburg* in recognizing the privilege. *See, e.g., Parsons v. Watson*, 778 F.Supp. 214, 216 (D.Del.1991) ("The variety of interpretations of *Branzburg* is astonishing."). Furthermore, our application of Third Circuit precedent in this matter is consistent with our general practice of deferring to the Third Circuit concerning federal questions. *See, e.g., Commonwealth v. Negri*, 419 Pa. 117, 213 A.2d 670, 672 (1965) (plurality) ("If the Pennsylvania courts refuse to abide by [the Third Circuit's] conclusions, then the individual to whom we deny relief need only to 'walk across the street' to gain a different result.). In fact, courts in the Commonwealth appear to have adhered to this principle by applying, without questioning, the Third Circuit's decisions that recognize the privilege. *See, e.g., Davis v. Glanton*, 705 A.2d 879, 885–87 (Pa.Super.1997); *McMenamin v. Tartaglione*, 139 Pa.Cmwlth. 269, 590 A.2d 802, 811 (1991), *aff'd per curiam*, 527 Pa. 286, 590 A.2d 753 (1991). Therefore, although we recognize the ongoing debate over the meaning of *Branzburg*, *see, e.g., United States v. Smith*, 135 F.3d 963, 969 (5th Cir.1998) (rejecting holding of *Cuthbertson* ), we nevertheless assume, without deciding, that *Branzburg* affords a qualified privilege to reporters.

journalist, in the course of gathering the news, acquires facts that become a target of discovery, a qualified privilege against compelled disclosure appertains."); *Coughlin v. Westinghouse Broad. & Cable, Inc.,* 780 F.2d 340, 350 (3d Cir.1985) (Becker, J., concurring) ("In the wake of *Branzburg,* courts faced with assertions of reporters' privileges have proceeded on a case-by-case basis, balancing the reporters' rights against the interests of those seeking information." (footnote omitted)). Bowden and Washington contend that the Commonwealth has failed to overcome this qualified privilege because it failed to explore all possible avenues to obtain Tyson's statements, failed to demonstrate that the reporters were the only sources of the information, and did not show that Tyson's statements were necessary and crucial to its case. The reporters also assert that the lower courts' failure to find the reporters' materials to be privileged will have a chilling effect on the ability of journalists to investigate matters involving the criminal justice system. Consequently, the reporters maintain that we must rule in their favor to protect the important public function served by the news media. Once again, we disagree.

In invoking a qualified privilege for reporters in *Riley, Cuthbertson I,* and *Criden,* the Third Circuit relied upon the concurring opinion of Justice Powell in *Branzburg,* where he stated that:

The asserted claim to privilege should be judged on its facts by the striking of a proper balance between freedom of the press and the obligation of all citizens to give relevant testimony with respect to criminal conduct. The [b]alance of these vital constitutional and societal interests on a case-by-case basis accords with the tried and traditional way of adjudicating such questions.

*Riley,* 612 F.2d at 716 (quoting *Branzburg,* 408 U.S. at 710, 92 S.Ct. 2646 (Powell, J., concurring)) (emphasis omitted); *see also Criden,* 633 F.2d at 357 (quoting same). Based in large part on the foregoing language, the Third Circuit determined that a court "must balance on one hand the policies which give rise to the privilege and their applicability to the facts at hand against the need for the evidence sought to be obtained in the

case at hand." *Riley*, 612 F.2d at 716; *see Cuthbertson I*, 630 F.2d at 148 ("Because the privilege is qualified, there may be countervailing interests that will require it to yield in a particular case . . . . (citation omitted))"; *see also Criden*, 633 F.2d at 356 (stating that a case-by-case balancing test applies); *Davis v. Glanton*, 705 A.2d 879, 885 (Pa.Super.1997) (same); *McMenamin v. Tartaglione*, 139 Pa.Cmwlth. 269, 590 A.2d 802, 811 (1991) (same), *aff'd per curiam*, 527 Pa. 286, 590 A.2d 753 (1991).

To assist the lower courts in conducting this balancing, the Third Circuit has set forth several factors that the courts should consider. As an initial matter, the circuit court has acknowledged that those asserting the privilege must overcome the well-settled principle that evidentiary privileges are not favored in litigation because they are in derogation of the search for truth. *Criden*, 633 F.2d at 357–58 (citation omitted). With that principle in mind, the court has stated that it is important for courts faced with privilege questions to consider whether a reporter's source is confidential, because the lack of a confidential source is a factor that favors production. *See Cuthbertson I*, 630 F.2d at 147; *see also Criden*, 633 F.2d at 355–56 (discussing at length the value of confidential sources, and stating that the need for such confidentiality is the foundation of the reporters' privilege). As the court explained:

> [T]here is a general expectation in certain sectors of society that information flows more freely from anonymous sources. Experience in the operation of such public service facilities as hotels, restaurants, and common carriers shows that proprietors often solicit from their customers anonymous information grading the service received. Law enforcement officials frequently rely on anonymous tips. The rule protecting a journalist's source therefore does not depart significantly from daily experience in informal dissemination of information.

*Criden*, 633 F.2d at 356 (footnote omitted). The Third Circuit has also stated that the privilege assumes greater importance in civil than in criminal cases, as in criminal cases the public

need to vindicate crime, or the defendant's constitutional right to a fair trial, can take precedence over a reporter's need to maintain confidentiality. *See In re Grand Jury Matter, Gronowicz,* 764 F.2d 983, 986 (3d Cir.1985) (*en banc*) ("[T]he press privilege recognized in the cited cases is a qualified one, which yields, if the circumstances so require, to the compelling governmental interest in investigation of crime."); *Cuthbertson I,* 630 F.2d at 147 (criminal defendant's constitutional rights "are important factors that must be considered in deciding whether, in the circumstances of an individual case, the privilege must yield to the defendant's need for the information); *Riley,* 612 F.2d at 716 (case-by-case approach is mandated even more in civil cases than in criminal cases, for in the former the public's interest in casting a protective shroud over the newsmen's sources and information warrants an even greater weight than in the latter." (citation omitted)). In this regard, the court has placed particular emphasis on the production of evidence in criminal trials, and has directed that courts must assure that all relevant and admissible evidence is produced in order to protect the constitutional rights of criminal defendants. *Criden,* 633 F.2d at 358. Finally, the Third Circuit has recognized that the status of the media member as a party or non-party witness is relevant to the balancing inquiry, explaining that it should be more difficult to compel production from a non-party witness who has no personal interest in the matter. *See Riley,* 612 F.2d at 716 ("This is not a situation where the reporter is alleged to possess evidence relevant to a criminal investigation.... This is simply a situation where a journalist has been called as a witness to a civil suit in which neither she nor her employer has any personal interest.); *see also In re Grand Jury Matter, Gronowicz,* 764 F.2d at 990 & n. 2 (Garth, J., concurring) (status of party claiming reporters' privilege, "as the target of the investigation, distinguishes this case from other cases in which a qualified common-law privilege was accorded third-party witnesses asked to reveal confidential sources.").

With the foregoing considerations as a backdrop, the Third Circuit has set forth a three-part test that a party seeking to

overcome the qualified reporters' privilege must satisfy. First, the party "must demonstrate that [it] has made an effort to obtain the information from other sources." *Criden,* 633 F.2d at 358–59; *see United States v. Cuthbertson,* 651 F.2d 189, 195–96 (3d Cir.1981) (*"Cuthbertson II"*) (same); *Riley,* 612 F.2d at 717 (same). Second, the party "must demonstrate that the only access to the information sought is through the journalist and [his or] her sources." *Criden,* 633 F.2d at 359; *see Riley,* 612 F.2d at 716 (stating that a showing is required as to the lack of alternative sources); *Davis,* 705 A.2d at 885 (same); *McMenamin,* 590 A.2d at 811 (same). Third and finally, the party "must persuade the court that the information sought is crucial to [its] claim." *Criden,* 633 F.2d at 359; *see Cuthbertson II,* 651 F.2d at 196 (same); *see also Riley,* 612 F.2d at 716 ("the materiality, relevance and necessity of the information sought must be shown), 717 (information must be crucial information necessary for the development of the case; material sought must 'provide a source of crucial information going to the heart of the [claim]' (citation omitted; alteration in original)); *Davis,* 705 A.2d at 885 (stating that party must demonstrate that information is crucial" to its case); *McMenamin,* 590 A.2d at 811 (same). The court has emphasized, however, that the principles and policy considerations set forth above must inform the application of the three-part test and, in fact, may warrant relaxation of the test in certain circumstances. *See Criden,* 633 F.2d at 358 ("We need not develop a precise test for the peculiar circumstances presented here, although we will venture the view that the defendants probably should be required to prove less to obtain the reporter's version of a conversation already voluntarily disclosed by the self-confessed source than to obtain the identity of the source itself.").

 Here, there is no need to relax the test, as the Commonwealth has clearly satisfied the three prongs articulated above. With respect to the first criterion, whether the Commonwealth has made an effort to obtain the information from other sources, we begin by pointing out that the number of potential sources for Tyson's statements is necessarily limited

to the two reporters and Tyson, as no other individuals were present during the interviews. Moreover, Tyson was not a viable source because the Commonwealth could not have forced him to produce the statements without running afoul of the Fifth Amendment guarantee against compelled self-incrimination. In addition, this conclusion is unchanged by the fact that Tyson waived his constitutional privilege by testifying in his own defense because, assuming that there were inconsistencies between his unpublished statements and the statements he made to authorities, it is patently unreasonable to assume that Tyson, while under the stress of cross-examination, would have been able or willing to recount accurately the statements he made to Bowden and Washington in some instances over two years prior to trial. Instead, there is a real possibility that a criminal defendant in these circumstances might render a self-serving account of his statements in which he would deny all inconsistency, and the Commonwealth, left without the defendant's actual statements to reporters, would lack a concrete means for confronting such testimony. Thus, Tyson is not an acceptable source for the information, not only because it is his own credibility that is at issue, but also because his statements, as they appear in the reporters' notes, are by their very nature unique. As the Third Circuit has explained:

> [T]he only material we are concerned with in this case is the verbatim and substantially verbatim statements held by [the media entity] of witnesses that the government intends to call at trial. By their very nature, these statements are not obtainable from any other source. They are unique bits of evidence that are frozen at a particular place and time. Even if the defendants attempted to interview all of the government witnesses and the witnesses cooperated with them, the defendants would not obtain the particular statements that may be useful for impeachment purposes at trial.

*Cuthbertson I,* 630 F.2d at 148; *see Cuthbertson II,* 651 F.2d at 196 (same); *In re Grand Jury Empaneled Feb. 5, 1999,* 99 F.Supp.2d 496, 500–01 (D.N.J.2000) (finding audiotaped statements of criminal defendant to be unique); *Doe v. Kohn Nast*

*& Graf, P.C.,* 853 F.Supp. 147, 149–50 (E.D.Pa.1994) (*"Doe I "*) (finding videotaped statements of party-opponent in civil case to be unique and thus not available from another source). Therefore, as Tyson is not a viable source for the statements, we must conclude that Bowden and Washington were the only feasible sources of Tyson's statements.[11] *See Criden,* 633 F.2d at 359 (first criterion held satisfied where the reporter was "the most logical source of information about the conversation with [the source] because [the reporter] was the other participant in it."). Consequently, it was unnecessary for the Commonwealth to attempt to seek Tyson's statements elsewhere, as any such effort would have been futile. *See Davis,* 705 A.2d at 885–86 ( [S]ince [the defamation defendant's] comments were made during an interview with a[] [newspaper] reporter at which no one else was present, the reporter's notes, the only memorialization of the conversation, are the only source of such information and it would be futile to seek it elsewhere."). Accordingly, the Commonwealth has satisfied its burden with regard to the first criterion. *Cf. Criden,* 633 F.2d at 359 (holding first criterion satisfied).

▇ Regarding the second criterion, whether the Commonwealth has demonstrated that the only access to the information sought is through the reporters and their sources, the analysis is the same as that relating to the first criterion. *See Criden,* 633 F.2d at 359 (stating that analysis applied to first criteria also applied to second); *In re Grand Jury Empaneled Feb. 5, 1999,* 99 F.Supp.2d at 501 (same). Specifically, as stated above, Bowden and Washington are the only feasible sources of Tyson's statements. Therefore, the Commonwealth has necessarily demonstrated that the only access to Tyson's

11. The reporters' contention that the articles themselves constituted an alternative source misses the mark because the trial court's order pertains to Tyson's published *and* unpublished statements. As the articles did not contain Tyson's unpublished statements, they were not a viable alternative source. *See In re Grand Jury Empaneled Feb. 5, 1999,* 99 F.Supp.2d at 500 (finding published article to be insufficient alternative to original audiotape source because, "[i]n order for the grand jury to properly assess the evidence, it must be able to hear the actual conversation between the reporter and [the subject of the grand jury inquiry], and not just read mere snippets of the interview printed in the article.").

statements is through the two journalists. *Cf. Criden*, 633 F.2d at 359 (holding second criterion satisfied based on satisfaction of first).

 Finally, with respect to the third criterion, whether the Commonwealth has demonstrated that Tyson's statements were "crucial" to its case, we find this requirement satisfied because the statements sought were both "relevant and important" to the Commonwealth's case.[12] *See Criden*, 633 F.2d at

**12.** Unlike Bowden and Washington, who read the term "crucial" in its most restrictive sense, we read that term in accordance with the meaning that the Third Circuit has ascribed to it. Specifically, in *Criden*, the most recent decision in the *Riley–Cuthbertson I–Criden* trilogy, the court deemed the requirement that the information be "crucial" to be a requirement of its "relevance and importance." *See Criden*, 633 F.2d at 359 (stating that third prong of burden requires showing that information sought is "crucial"; three paragraphs later stating that "[t]he final criterion under *Riley*, *relevance and importance* to the particular proceeding, follows from the preceding discussion." (emphasis added)); *In re Grand Jury Empaneled Feb. 5, 1999*, 99 F.Supp.2d at 501 ("Relevance and importance to the particular proceeding is the final criterion under *Riley*."); *cf. Riley*, 612 F.2d at 716 ("In striking the delicate balance between the assertion of the privilege on the one hand and the interest of either criminal or civil litigants seeking the information the materiality, relevance and necessity of the information sought must be shown."). Moreover, our understanding of this third requirement is consistent with that found in Justice Stewart's dissenting opinion in *Branzburg*, which has been widely recognized as the source of the three-pronged inquiry. *See Branzburg*, 408 U.S. at 743, 92 S.Ct. 2646 (Stewart, J., dissenting) ("I would hold that the government must ... demonstrate a compelling and overriding interest in the information"); *see also Matter of Contempt of Wright*, 108 Idaho 418, 700 P.2d 40, 43 (1985) ("Courts finding a qualified privilege generally have applied a balancing test similar to one proposed by Justice Stewart in his *Branzburg* dissent.") In any event, even if we were to read crucial in the restrictive sense advocated by Bowden and Washington, we would find that the showing required by the third criterion must be relaxed in accordance with the guidance of the *Criden* court, given that this case does not require the disclosure of a confidential source and is a criminal case rather than a civil case. *See Criden*, 633 F.2d at 358 (party seeking to overcome privilege "probably should be required to prove less to obtain the reporter's version of a conversation already voluntarily disclosed by the self-confessed source than to obtain the identity of the source itself"); *Riley*, 612 F.2d at 716 ("This is not a situation where the reporter is alleged to possess evidence relevant to a criminal investigation."); *In re Grand Jury Empaneled Feb. 5, 1999*, 99 F.Supp.2d at 501 ("The seeker of information is required to prove less where, as here, the information sought is nonconfidential and the source self-avowed.).

359. Significant in this regard is the fact that Tyson's defense at trial rested entirely on his claim that he shot Millner in self-defense:

> [TYSON'S ATTORNEY]: . . . .
>
> Ladies and gentlemen, I will conclude by saying this: Brian Tyson is not guilty of murder because he acted in self-defense. Brian Tyson is not guilty of manslaughter because he acted in self-defense. Brian Tyson is not guilty of possessing an instrument of crime because there was no crime. He shot somebody. He killed somebody. All shootings that result in death are not murders. All shootings that result in death are not manslaughter. Ask any police officer. Ask any soldier. Brian Tyson acted in self-defense.

R.R. 457a (Trial Vol. 4, Dec. 14, 2000, at 114–15). The Commonwealth, on the other hand, was seeking to prove that Tyson committed the killing as an act of vigilantism:

> [COMMONWEALTH'S ATTORNEY]: . . . .
>
> Counsel said something about if you are in a war. This was not war. He was not licensed to kill. He is a citizen like anybody else and as he told [the police before the shooting], if you don't take care of it, I will. Well, he did not have that right and you, ladies and gentlemen, I would ask to tell him that he did not have that right. . . .
>
> . . . If we had people taking the law into their own hands, it would be the Wild, Wild West and not a civilized society.

R.R. 465a (Trial Vol. 4, Dec. 14, 2000, at 144–45). Thus, this case turned on what the jury believed Tyson's mental state was at the moment he fired his weapon. All of Tyson's statements about the shooting, whether published or unpublished, would directly reflect this mental state, as they would manifest his version of how and why the events on the night of the shooting took place. Accordingly, Tyson's statements about the shooting were plainly "relevant and important" to a determination of whether Tyson acted in self-defense. In addition, Tyson's statements regarding his relationship with the local drug dealers are of identical import, as such statements would be of significant value to the jury in evaluating

the veracity of the Commonwealth's contention that Tyson killed Millner in an effort to rid his neighborhood of drugs. Finally, Tyson's statements to Bowden and Washington, to the extent that they conflicted with his prior statements to the police, were also "relevant and important" because the Commonwealth could have used those statements to impeach Tyson's credibility once he took the stand to proclaim that the shooting was in self-defense. *Cf. Cuthbertson II*, 651 F.2d at 196 ("If [the sources'] testimony at trial differs from their [prior] statement to [the media entity], the defendants will have the opportunity to obtain the materials for impeachment purposes."); *Criden*, 633 F.2d at 359 (holding third criterion satisfied where source's "motivation and credibility" at issue); *Davis*, 705 A.2d at 885 (We agree that given the ambiguity of the published statement, information as to the context in which it was made is relevant, material, necessary and crucial to plaintiffs' attempt to prove that [the defendant] defamed them."). Consequently, we conclude that the Commonwealth has demonstrated that Tyson's statements were "crucial" to its claims,[13] and, therefore, find that the Commonwealth has

---

13. Most of the reporters' contentions with respect to the third criterion are undermined by their underlying reliance on a mistaken interpretation of the term "crucial." *See supra* note 12. Even putting that error aside, however, the reporters' assertion that it was inappropriate for the lower courts to make any assumptions regarding the importance of Tyson's unpublished statements is suspect given that any such determination was thwarted by the reporters' refusal to produce the statements even for *in camera* review. *See* R.R. 24a–25a (Trial Vol. 1, Dec. 1, 2000, at 31–34). If, for example, Tyson had told either Bowden or Washington, "I purposefully shot Millner to rid my neighborhood of drugs," that statement undoubtedly would have been "relevant and important" to the Commonwealth's case. *Cf.* R.R. 25a (Trial Vol. 1, Dec. 1, 2000, at 35) ("**THE COURT:** There is an allegation [Tyson] saw [Millner] with a gun but let's say he told Mr. Bowden [']I saw him with a knife,['] that is pretty crucial information to the Commonwealth."). Indeed, such a stunning admission would have been "crucial" even in the sense that Bowden and Washington employ that term, as it could easily have persuaded the jury to find Tyson guilty of first-degree murder rather than third-degree murder. On the other hand, if Tyson's statements had been completely innocuous and devoid of inconsistency, their "relevance and importance" would obviously have been diminished. Absent disclosure or *in camera* review, there was simply no way to make that determination. *Compare Doe I*, 853 F.Supp. at 149–50 (finding undisclosed statements to be "relevant evidentiary material"

satisfied its burden to overcome the qualified privilege as recognized by the Third Circuit. *See Criden,* 633 F.2d at 359 (holding burden to overcome privilege satisfied in criminal case); *In re Grand Jury Empaneled Feb. 5, 1999,* 99 F.Supp.2d at 501 (holding burden to overcome privilege satisfied in criminal case where prosecution sought audiotape from interview between newspaper reporter and subject of grand jury inquiry); *Davis,* 705 A.2d at 885–86 (holding burden to overcome privilege satisfied).

■ Significantly, this conclusion is consistent with the bulk of the considerations identified by the Third Circuit as informing the three-part test.[14] In particular, the interest in confidentiality is simply not implicated in this case, as Tyson made no effort to conceal his identity and freely communicated with Bowden and Washington about the shooting and his relationship with the local drug dealers. *See Criden,* 633 F.2d at 356 n. 6 ("The scope of the privilege is limited by its underlying purpose. Thus, where the disclosure of the contents of a communication will not tend to reveal the identity of an informer, the contents are not privileged . . . ." (citation omitted)). As Judge Rambo explained in her concurring opinion in *Criden:*

> The most cogent argument for the recognition of a newsman's privilege is that the free flow of information to the media will be encouraged if one desiring to communicate information, but fearing exposure, can be assured that his identity will never come to light unless he permits it. Whatever legitimacy this rationale may have, it disappears

that must be submitted for *in camera* review), *with Doe v. Kohn, Nast & Graf, P.C.,* 853 F.Supp. 150, 151–52 (E.D.Pa.1994) (*"Doe II "*) (subsequent finding that statements that were submitted for *in camera* review were not "crucial" to claims raised). Additionally, we are also not persuaded by the reporters' repeated insistence that the Commonwealth's failure to put Tyson's published statements to significant use at trial undermines the need for Tyson's statements, as the "relevance and importance" of those statements does not hinge on the use to which they are ultimately put by the Commonwealth.

14. In fact, only the reporters' status as non-party witnesses weighs in favor of non-disclosure.

once the source willingly identifies himself and consents to disclosure of his communication. . . .

*Id.* at 360–61 (Rambo, J., concurring). Put differently, our decision here will not have a "chilling effect" on the flow of information from confidential sources, *see Cuthbertson I,* 630 F.2d at 147, as the revelation of Tyson's statements does not threaten his own confidentiality or that of another, secondary source. Additionally, the interest in disclosure in this case, a criminal matter, exceeds that of a civil matter due to the public need for access to evidence in order to vindicate crime.[15] *See In re Grand Jury Matter, Gronowicz,* 764 F.2d at 986; *Riley,* 612 F.2d at 716. Finally, disclosure is also warranted in this case based on the general principle that evidentiary privileges are disfavored because they are in derogation of the search for truth. *Criden,* 633 F.2d at 357–58 (citation omitted).

In conclusion, the Commonwealth has met the burden imposed by the Third Circuit on those attempting to surmount the qualified reporters' privilege that has been recognized by that court. Accordingly, the privilege does not protect Bowden and Washington from compelled disclosure of Tyson's statements in accordance with the trial court's December 4, 2000 order.

## C

■ In its appeal, the Commonwealth maintains that the Superior Court erred in holding the trial court's sanction order to be "harsh and excessive" and remanding for a recalculation of the sanction to be imposed.[16] Specifically, the

---

15. This is wholly consistent with, and a repeated theme of, *Branzburg. See* 408 U.S. at 690–91, 695, 697–98, 92 S.Ct. 2646 (emphasizing public interest in law enforcement).

16. We also note the Commonwealth's contention that the Superior Court should not have addressed the reporters' contention that the trial court's sanction order was excessive because the reporters waived this issue by failing to raise it before the trial court. We disagree, as the record clearly reflects that the reporters urged the trial court to order a smaller contempt sanction than what it ultimately ordered. *See, e.g.,* R.R. 387a (Trial Vol. 1, Dec. 13, 2000, at 100) ("[**BOWDEN'S ATTORNEY**] . . . [W]hat I would ask the Court to do is if the Court is going to

Commonwealth contends that the Superior Court should not have substituted its own judgment for that of the trial court because the trial court acted within its discretion in setting the sanction. The Commonwealth asserts that the trial court's sanction was justified due to the reporters' persistent refusal to comply with the trial court's order and in light of the ability of the *Inquirer* and *Tribune* to pay the sanction imposed.[17] Thus, the Commonwealth maintains that we must reverse the order of the Superior Court to the extent that it vacated the trial court order and remanded for a recalculation of the sanction. We disagree, although our reasoning differs from that offered by the Superior Court.

Courts possess an inherent power to enforce their orders by way of the power of contempt. *Brocker v. Brocker*, 429 Pa. 513, 241 A.2d 336, 338 (1968); *see also Mulligan v. Piczon*, 566 Pa. 214, 779 A.2d 1143, 1149 (2001) (Op. in Supp. of Affirmance) ("It is fundamental that courts possess inherent power to enforce compliance, and to punish non-compliance, with their lawful orders."); *Bata v. Cent.-Penn Nat'l Bank*, 433 Pa. 284, 249 A.2d 767, 768 (Pa.1969) (plurality) ("*Bata II* ") ("The interests of orderly government demand that respect and compliance be given to orders issued by courts possessed of jurisdiction of persons and subject matter." (citation omitted)).[18] Generally, contempt can be criminal or civil in nature, and depends on whether the core purpose of the sanction imposed is to vindicate the authority of the court, in which case the contempt is criminal, or whether the contempt is to aid the beneficiary of the order being defied, in which case it is civil. *Commonwealth v. Marcone*, 487 Pa. 572, 410 A.2d 759, 762 (1980); *In re Martorano*, 464 Pa. 66, 346 A.2d 22, 27–28

issue an order of contempt, to impose a minimal sanction, which is what the Court in the Cuthbertson case did, the Third Circuit where they imposed a dollar-a-day fine.").

**17.** It is essentially uncontested by the parties that the *Inquirer* and *Tribune* will ultimately pay whatever sanctions are imposed on the two reporters.

**18.** We refer to the noted case as "*Bata II* " due to a prior disposition by this Court in the same matter. *See Bata v. Cent.-Penn Nat'l Bank*, 423 Pa. 373, 224 A.2d 174 (1966) ("*Bata I* ").

(1975). Civil contempt orders, in turn, usually occur as one of two sub-species: compensatory or coercive. *Bata v. Cent.-Penn Nat'l Bank,* 448 Pa. 355, 293 A.2d 343, 354 n. 21 (1972) (*"Bata III "*); *Brocker,* 241 A.2d at 339. Compensatory civil contempt, as its moniker suggests, involves compensation that is paid to the party whom the contempt has harmed. *Bata III,* 293 A.2d at 352–53 & n. 13; *Brocker,* 241 A.2d at 339. On the other hand, a coercive civil contempt citation, such as the one in the instant case, is intended to coerce the disobedient party into compliance with the court's order through incarceration and/or monetary punishment. *Bata III,* 293 A.2d at 354 n. 21; *Brocker,* 241 A.2d at 339; *Knaus v. Knaus,* 387 Pa. 370, 127 A.2d 669, 673 (1956). Before a trial court may enter a coercive civil contempt order, however, this Court requires consideration of several relevant factors:

But where the purpose is to make the defendant comply, the court's discretion is otherwise exercised. It must then consider the character and magnitude of the harm threatened by continued contumacy, and the probable effectiveness of any suggested sanction in bringing about the result desired.

It is a corollary of the above principles that a court which has returned a conviction for contempt must, in fixing the amount of a fine to be imposed as a punishment or as a means of securing future compliance, consider the amount of defendant's financial resources and the consequent seriousness of the burden to that particular defendant.

*Brocker,* 241 A.2d at 339 (quoting *United States v. United Mine Workers,* 330 U.S. 258, 304, 67 S.Ct. 677, 91 L.Ed. 884 (1947)); *see also Dep't of Envtl. Res. v. Pa. Power Co.,* 461 Pa. 675, 337 A.2d 823, 832 (1975) (plurality) (probable effectiveness of coercive contempt sanction is inherent aspect of trial court's inquiry); *Flannery v. Iberti,* 763 A.2d 927, 929 (Pa.Super.2000) (ability to comply key consideration in determining propriety of civil contempt order); *Schnabel Assocs., Inc. v. Bldg. & Constr. Trades Council,* 338 Pa.Super. 376, 487 A.2d 1327, 1338–39 (1985) (trial court must consider ability of party to pay before entering monetary contempt sanction); *Davis v.*

*SEPTA,* 30 Phila. 246, 255 (Com.Pl.Phila.1995) (court must consider character and magnitude of harm threatened and probable effectiveness of sanction).

■■■ Based on the foregoing, it is clear that the appellate courts of this Commonwealth may, under certain circumstances, find that a trial court's monetary contempt sanction is inappropriate. *See, e.g., Bata II,* 249 A.2d at 769–70 (indefinite nature of monetary contempt sanction precludes determination of propriety of sanction); *Schnabel Assocs.,* 487 A.2d at 1338–39 (remanding matter for hearing where trial court failed to consider ability of party in contempt to pay civil contempt sanction); *see also Bata II,* 249 A.2d at 770 (Bell, C.J., concurring) (opining that conditional sanction of $250,000 was excessive under circumstances presented, therefore warranting remand for modification). In reviewing a claim that such a contempt sanction is improper, however, the appellate court must affirm the trial court's order unless that court has committed an abuse of discretion. *Bata II,* 249 A.2d at 768 ("Because of the nature of these [contempt] standards, great reliance must be placed upon the discretion of the trial judge."); *see also Commonwealth v. Baker,* 564 Pa. 192, 766 A.2d 328, 331 (2001) (trial court finding of contempt will not be disturbed absent abuse of discretion); *Garr v. Peters,* 773 A.2d 183, 189 (Pa.Super.2001) (same). We have described the meaning of this standard as follows:

> The term "discretion" imports the exercise of judgment, wisdom and skill so as to reach a dispassionate conclusion, and discretionary power can only exist within the framework of the law, and is not exercised for the purpose of giving effect to the will of the judges. Discretion must be exercised on the foundation of reason, as opposed to prejudice, personal motivations, caprice or arbitrary action. Discretion is abused when the course pursued represents not merely an error of judgment, but where the judgment is manifestly unreasonable or where the law is not applied or where the record shows that the action is a result of partiality, prejudice, bias or ill will.

*Commonwealth v. Shaffer,* 551 Pa. 622, 712 A.2d 749, 751 (1998) (plurality) (quoting *Coker v. S.M. Flickinger Co.,* 533 Pa. 441, 625 A.2d 1181, 1184–85 (1993)); *see also United Parcel Serv., Inc. v. Pa. Pub. Util. Comm'n,* 830 A.2d 941, 948 (Pa.2003) (abuse of discretion committed where decision made in unreasoned framework).

In the instant case, as noted above, the trial court decided on a sanction during a mid-trial hearing that it held during a break in the presentation of Tyson's defense. At this hearing, the Commonwealth requested that Bowden and Washington be held in civil contempt and imprisoned until they complied with the trial court's order. The court, however, suggested that a monetary sanction would be more appropriate:

> Let me ask you this: Rather than forcing compliance or attempting to force compliance through incarceration, what would be the problem with a remedy of a thousand dollars an hour until compliance? I have not heard of that but I think that would be more helpful to the Court than just about anything.

R.R. 385a (Trial Vol. 1, Dec. 13, 2000, at 93). The Commonwealth and the reporters debated this possibility, with the reporters ultimately arguing for the court to impose a sanction of one dollar per day until compliance. After rejecting this suggestion, the court indicated, apparently not at the behest of either the Commonwealth or the reporters, that a different monetary sanction might be in order:

> ... We are in a position now where it is 12:30. The jury is coming back at 1:30. We will start up at a quarter to 2:00 with cross examination.
>
> By my count, that is seventy-five minutes. I would make it $100.00 a minute until there is compliance, that would be accurate and I suppose for the paper and certainly for the cost of the litigation that has already gone on, that is probably pretty minimal but I would do $100.00 a minute until compliance and I think that is extremely reasonable since it will not last much more than an hour-and-a-half from now, at best, before the Commonwealth is beyond the point.

R.R. 387a (Trial Vol. 1, Dec. 13, 2000, at 102–03). In response, the Commonwealth urged the trial court to consider increasing the sanction and also to reconsider the Commonwealth's request that the reporters be incarcerated. The court responded:

> I don't want to make these reporters into martyrs, that would not be in anyone's interest, quite frankly, and that is the reason why I am not incarcerating them. I don't think they would be harmed particularly actually by being incarcerated and I don't think virtually any amount of money between now and the time that you are so handicapped that would make the difference here. Even if I did $10,000 a minute, they would probably pay that. I would have to do a million dollars a minute before I would be anywhere near what they would be thinking is in the realm of really severe, so it is to a certain extent something that they have to think about and they should think about and despite the fact that they can certainly afford $100.00 a minute, hopefully they are not taking lightly the fact that they are disobeying this order. I believe they would not be.

R.R. 388a (Trial Vol. 1, Dec. 13, 2000, at 105). After additional debate about the sanction to be imposed, counsel for Washington pointed out to the trial court that the $100 per minute sanction suggested by the court could have a disproportionate financial impact on the *Tribune*. The court replied:

> The point is to go through the standards that are applicable and decide the case in that way and I don't know the monetary situation of either the Inquirer or the Tribune. You may be in the black and they may be in the red. I don't know but it seems to me that even for the Tribune, I suspect, as though you say your situation may be different, I think even for the Tribune, it is somewhat nominal at $100.00 a minute.

R.R. 389a (Trial Vol. 1, Dec. 13, 2000, at 109–10). After counsel for Washington acknowledged its understanding of the trial court's position, the court continued:

> I think you should be real happy with that. I understand it is somewhat nominal but, at this point, I don't think

$10,000 a minute is going to get compliance either, quite frankly, but I do expect you to pay this fine, this contempt fine such as it is.

R.R. 389a (Trial Vol. 1, Dec. 13, 2000, at 110). As it appeared by that point that the court had settled on a $100 per minute sanction, Bowden's attorney then inquired as to the length of time that would be covered by the order, as was previously alluded to by the court. The court then decided to extend the time period beyond the one and one-half hours it originally suggested:

Until we are ready to go to trial, until we are all together, so it will go to that point and, frankly, it should go beyond. I don't know what they may use this information for, so it is really going to go until the Commonwealth's case is closed on rebuttal and that assumes no surrebuttal, so it will go until that point. In honesty, I expect that to be today and relatively soon today but maybe it will go until tomorrow and then the $100.00 will mount up, indeed.

R.R. 389a (Trial Vol. 1, Dec. 13, 2000, at 110–11). Shortly thereafter, the trial court entered a coercive civil contempt citation requiring Bowden and Washington to each pay $100 per minute until either they complied with the court's December 4, 2000 order or the Commonwealth rested its case on rebuttal.

Based on the foregoing, we have little trouble concluding that the trial court committed an abuse of discretion, as the decision-making process underlying the trial court's sanction order reflects a failure to apply the standards articulated above. For example, although the record does perhaps reflect a consideration of the "character and magnitude of the harm threatened by continued contumacy," *Brocker*, 241 A.2d at 339 (citation omitted); *see* R.R. 387a (Trial Vol. 1, Dec. 13, 2000, at 100–01), the trial court did not make any finding with respect to "the probable effectiveness of any suggested sanction in bringing about the result desired." *Brocker*, 241 A.2d at 339 (citation omitted); *see Pa. Power*, 337 A.2d at 832 (probable effectiveness of coercive contempt sanction is inherent aspect of trial court's inquiry). To the contrary, the court's com-

ments during the hearing reveal a significant degree of skepticism about the effectiveness of its sanction. *See, e.g.,* R.R. 388a (Trial Vol. 1, Dec. 13, 2000, at 105) ("I don't think virtually any amount of money between now and the time [the Commonwealth would need the statements] would make the difference here."); R.R. 389a (Trial Vol. 1, Dec. 13, 2000, at 110) ("[A]t this point, I don't think $10,000 a minute is going to get compliance either, quite frankly....."). Moreover, the trial court's statements reflect a failure to "consider the amount of [the disobedient party's] financial resources and the consequent seriousness of the burden to that particular [party]." *Brocker,* 241 A.2d at 339 (citation omitted); *see Schnabel Assocs.,* 487 A.2d at 1338–39 (remanding matter for hearing where trial court failed to consider ability of party in contempt to pay civil contempt sanction); *cf. Fenstamaker v. Fenstamaker,* 337 Pa.Super. 410, 487 A.2d 11, 16 (1985) (sanction imposed upon finding of civil contempt was not abuse of discretion in light of contemnor's sizeable assets). Indeed, although the court appeared to speculate that the two newspapers could afford the sanctions the court had decided to impose, it specifically disavowed having any knowledge of the two newspapers' financial condition.[19] *See* R.R. 389a (Trial Vol. 1, Dec. 13, 2000, at 110) ("I don't know the monetary situation of either the Inquirer or the Tribune. You may be in the black and they may be in the red."). Therefore, as the record reflects the trial court's failure to apply the relevant coercive civil contempt standards, the Superior Court correctly vacated its order as an abuse of discretion.[20] *See Shaffer,*

19. The Commonwealth's reference in its brief to the financial condition of the *Inquirer*'s parent organization does not change the fact that the trial court did not address this consideration in the first instance.

20. We also find noteworthy the apparent degree of caprice that infected the trial court's decision-making process. For example, the court initially, and rather arbitrarily, suggested a $1,000 per hour sanction. *See* R.R. 385a (Trial Vol. 1, Dec. 13, 2000, at 93) ("I have not heard of [a sanction of $1,000 per hour until compliance] but I think that would be more helpful to the Court than just about anything."). Moments later, however, the court changed its mind and decided on a $100 per minute sanction, the equivalent of a $6,000 per hour sanction, or six times the court's originally suggested figure. *See* R.R. 387a (Trial Vol. 1, Dec. 13, 2000, at 102–03). Moreover, the court initially stated that

712 A.2d at 751 ("[D]iscretionary power can only exist within the framework of the law.... Discretion is abused ... where the law is not applied ...." (citation omitted)); *see also Gen. Signal Corp. v. Donallco, Inc.*, 787 F.2d 1376, 1380 (9th Cir.1986) (matter remanded because record did not demonstrate trial court's consideration of relevant coercive civil contempt factors).

We are cognizant that the trial court was required to hold its hearing while simultaneously conducting a jury trial, and, as a result, was not in an ideal position to conduct a lengthy analysis of the factors described above. Nevertheless, we adhere to the requirement that these factors must be subjected to at least some examination by a trial court prior to entry of a coercive civil contempt order. *See Brocker*, 241 A.2d at 339. As the trial court did not conduct an evaluation of these factors, we are unable to conduct a meaningful review of the Superior Court's conclusion that the sanction imposed was excessive. *See PG Publ'g Co. v. Commonwealth ex rel. Dist. Attorney*, 532 Pa. 1, 614 A.2d 1106, 1109 (1992) ("In order for the appellate review of a trial court's discretionary ruling to be meaningful, the appellate court must understand the factual findings upon which a trial court's conclusions of law are based.). In fact, we venture to state that the Superior Court should not have reached this conclusion, as it too was without the benefit of the trial court's discussion of the relevant criteria. Accordingly, we conclude that the matter must be remanded to the trial court for reconsideration of the sanction

the applicable time period would last for approximately one and one-half hours, thus resulting in a $9,000 sanction. *See* R.R. 387a (Trial Vol. 1, Dec. 13, 2000, at 102–03). However, the court then decided that the time period should be extended until the Commonwealth completed its rebuttal, which in the end entailed six and two-thirds hours of trial time, and consequently resulted in a $40,000 sanction. *See* R.R. 389a (Trial Vol. 1, Dec. 13, 2000, at 110–11). Thus, the trial court essentially increased the sanction from $1,500 ($1,000 per hour over one and one-half hours) to $40,000 ($100 per minute over six and two-thirds hours) without any apparent rationale for doing so. *See Shaffer*, 712 A.2d at 751 ("Discretion must be exercised on the foundation of reason, as opposed to ... caprice or arbitrary action."); *United Parcel Serv.*, 830 A.2d at 948 (abuse of discretion committed where decision made in unreasoned framework).

to be imposed, but express no view regarding the Superior Court's conclusion that the sanction imposed by the trial court was excessive.[21]

## III

In sum, the tribunals below correctly concluded that the Shield Law does not protect Tyson's statements from disclosure in accordance with the trial court's December 4, 2000 order and the Commonwealth satisfied its burden to overcome the reporters' qualified privilege as embodied in relevant Third Circuit precedent. We further conclude that the Superior Court was correct in finding that the trial court committed an abuse of discretion with respect to the amount of the sanction it imposed on Bowden and Washington, albeit for different reasons than those presented by the Superior Court. Accordingly, we affirm the Superior Court's disposition of this matter.

The order of the Superior Court is affirmed, and the matter is remanded to the trial court for further proceedings not inconsistent with this opinion.

Justice LAMB files a concurring opinion.

Chief Justice Cappy files a dissenting opinion in which Mr. Justice Castille joins.

Justice LAMB, Concurring.

I join the majority in holding that the Pennsylvania Shield Law, 42 Pa.C.S. § 5942, does not protect Mark Bowden and Linn Washington, Jr. from disclosing Brian Tyson's statements. I write separately, however, to express my disagreement with the majority's conclusion that the facts of *In re Taylor*, 412 Pa. 32, 193 A.2d 181 (1963), are distinguishable from the instant case. As I would expressly overrule *In re Taylor*, I concur.

---

**21.** Of course, the trial court may not increase the contempt sanction on remand, as the Commonwealth did not challenge the trial court's initial monetary determination as insufficient via a cross-appeal.

Chief Justice CAPPY, Dissenting.

In my view, under the Pennsylvania Shield Law, 42 Pa.C.S. § 5942, Mark Bowden ("Bowden") and Linn Washington Jr. ("Washington") cannot be compelled to disclose Brian Tyson's ("Tyson") statements.[1] Accordingly, I respectfully dissent.

I begin with this court's decision in *In re Taylor*, 412 Pa. 32, 193 A.2d 181 (1963). For all intents and purposes, the relevant facts in *Taylor* are on all fours. There, as here, in connection with a criminal proceeding, the trial court ordered two newspapermen to produce documents that contained the unpublished statements that a disclosed source had made to reporters.[2] Raising the Shield Law, the newspapermen refused to comply with the order. The trial court determined that the Shield Law protects only persons, and found the newspapermen guilty of contempt.

On appeal, we reversed. Rejecting the trial court's interpretation of the Shield Law and concluding that the statute protects documents as well as persons, we held that the trial court could not compel the production of reporters notes and recordings, which included a disclosed sources statements. *Id.* at 184, 186.

We reached our decision by determining what the General Assembly intended the Shield Law to protect through its use of the words "the source of any information" in the statute. In this regard, we stated: "[w]e believe the language of the Statute is clear. The common and approved meaning or usage

---

1. The Shield Law provides in relevant part:

 § 5942. Confidential communications to news reporters

 (a) General rule.—No person engaged on, connected with, or employed by any newspaper of general circulation or any press association or any radio or television station, or any magazine of general circulation, for the purpose of gathering, procuring, compiling, editing or publishing news, shall be required to disclose the source of any information procured or obtained by such person, in any legal proceeding, trial or investigation before any government unit.

 42 Pa.C.S. § 5942(a).

2. There was a difference in the trial court orders. In *Taylor*, the trial court ordered that the names of persons be deleted from any materials produced. *Taylor*, 193 A.2d at 186. In this case, the trial court did not order a similar redaction.

of the words 'source of information' includes documents as well as personal informants. 'Source' means not only the identity of the person, *but likewise includes documents,* inanimate objects *and all source of information.* *Id.* at 184–85 (citations omitted) (emphasis in original). Significantly, in our interpretation of the meaning of the Shield Laws language, we did not distinguish between confidential and non-confidential sources or place limits on the information the statute protects.

We then stated that the Shield Law must be liberally construed in favor of the news media, and to make clear just how broadly protective the statute is, we took judicial notice of the fact that the tips and leads that the news media rely upon for reporting on matters of great public importance would dry up unless newsmen are able to *fully and completely* protect the sources of their information. *Id.* at 185 (emphasis in original).

We went on to explain why the trial courts direction that the names be redacted from produced materials, *see supra* n. 2, would have failed to serve the trial courts well-intentioned, but mistaken, belief that the Shield Law protects only persons, by pointing out that "[n]o one could know with certainty whether the documents as deleted by the newsman would still reveal sources of information which the [Shield Law] intended to protect. *Id.* at 186.

Further, we resolved that the trial court wrongly determined that the Shield Laws protection had been waived because the newspaper had named its source, stating that a waiver by a newsman applies only to the statements made by an informer which are actually published or publicly disclosed and not to other statements made by the informer to the newspaper. *Id.* (footnote omitted).

Finally, we clarified that the Shield Laws purpose, object and intent would be *realistically* nullified if the courts were to determine what information in documents should be protected and what information should be disclosed. *Id.* (emphasis in original).

This interpretation of the Shield Law drew a pointed dissent from Justice Cohen, who took issue with the determination that the statute covers both information and persons. Justice Cohen believed that the Shield Law covered only the identity of sources. He asserted that the purpose of the Shield Law "is to encourage the flow of news [from] persons who might otherwise fear the unfavorable publicity or retribution resulting from the revelation of their name as the source of the news story[,] and believed that [t]his purpose is accomplished by permitting the newsman to conceal the name of the informant." *Id.* at 187 (Cohen, J., dissenting). According to Justice Cohen, *it is the name of the informant and and* [sic] *not the information itself which is protected.* Once the name of the informant is revealed, the purpose and protection of the Act is terminated. *Id.* (emphasis in original).

In 1968, five years after *Taylor* was decided, the General Assembly amended the Shield Law to expand the statutes coverage to include reporters employed by the electronic and wire services.[3] Eight years after that, in 1976, the General Assembly reenacted the Shield Law in its entirety.[4] On both of these occasions, the legislature did not make changes to the words source of information in the statute. Thus, under the Statutory Construction Acts instruction, this court should presume that the legislature intends that we place on the Shield Law today the interpretation we gave those words in *Taylor.* *See* 1 Pa.C.S.1922(4).[5]

3. *See and compare* 28 Pa.C.S. § 330, Act of June 25, 1937, P.L. 2123, No.433, § 1, as amended Dec. 1, 1959, P.L. 1669, § 1 with *id.,* as amended July 31, 1968. P.L. 858, § 1.

4. *See* Judiciary Act of 1976, No. 142, § 2, ch. 59, subch. A, § 5942, 1976 Pa. Laws 586, 725–26.

5. The Statutory Construction Act provides in relevant part:

§ 1922. Presumptions in ascertaining legislative intent
In ascertaining the intention of the General Assembly in the enactment of a statute the following presumptions, among others, may be used:

\* \* \*

(4) That when a court of last resort has construed the language used in a statute, the General Assembly in subsequent statutes on the same

Accordingly, I believe that in the present case, the Shield Law protects Bowden and Washington from disclosing Tysons unpublished statements because the statute reflects our decision in *Taylor*, which, as I understand it, holds that the Shield Law protects a known source's information (like his statements) that has not been published.

The majority presently comes to a different result because it "read[s] [*Taylor*] as standing only for the proposition that documents are to be considered sources where their production, even with all the names redacted, could breach the confidentiality of a human source." (See Majority Opinion, 576 Pa. at 166, 838 A.2d at 749) (footnote omitted).[6] In other words, *Taylor* held that the Shield Law protects only persons, not information.

This is not, however, what this court's majority in *Taylor* held. It is, instead, the position that Justice Cohen took regarding the Shield Law's meaning in his dissenting opinion. *See Taylor* 193 A.2d at 187 (Cohen, J. dissenting). Thus, in the present case, the majority does not "read" *Taylor*, but rather, overrules and re-writes it.

In doing so, the majority violates two fundamental principles of Pennsylvania jurisprudence. First, the majority disregards the doctrine of stare decisis. As we have stated, the doctrine simply declares that, for the sake of certainty a conclusion reached in one case should be applied to those which follow, if the facts are substantially the same even though the parties may be different. *See Burtts Estate*, 353 Pa. 217, 44 A.2d 670, 677 (1945) (quotation omitted). Second, the majority ignores the prohibition against judicial legislation. In re-writing *Taylor*, the majority has amended the Shield

> subject matter intends the same construction to be placed upon such language.
> 1 Pa.C.S. § 1992(4).

**6.** At this point, I also observe that the sentence from *Taylor* that the majority cites to support its reading of that decision—that "[n]o one could know with certainty whether the documents as deleted by the newsman would still reveal sources of information which the [Shield Law]" intended to protect[], 193 A.2d at 186—served only to explain why the trial court would not have accomplished its goal to protect the identity of persons through its production order. *Id.* at 186.

Law, because *Taylor*, as originally written, is what the General Assembly intends the Shield Law to mean. *See* 1 Pa.C.S. 1922(4).[7]

I, therefore, respectfully dissent. And because I believe that the Shield Law does not allow a court to order Bowden and Washington to disclose Tyson's statements, I would reverse the Superior Court's order.[8]

Justice CASTILLE joins this dissenting opinion.

---

**7.** Our decision in *Hatchard v. Westinghouse Broadcasting Co.*, 516 Pa. 184, 532 A.2d 346 (1987), also illustrates my point. In that case, we held that "unpublished documentary information gathered by a television station is discoverable by a plaintiff in a libel action to the extent that the documentary information does not reveal the identity of a personal source of information or may be redacted to eliminate the revelation of a personal source of information." *Id.* at 348–49, 350–51. If *Taylor*, as written, stands for the proposition the majority ascribes to it, we would have based our decision in *Hatchard* on *Taylor*. However, we did not. Instead, in *Hatchard*, we expressly recognized that *Taylor* was inapplicable and grounded our interpretation of the Shield Law in defamation cases on the "constitutionalization" of the area and the fact that the Pennsylvania Constitution expressly identifies reputation as a fundamental interest. *Id.* at 348.

**8.** Inasmuch as I would reverse the Superior Court's order on a statutory basis, I would not reach the issue raised under the First Amendment to the United States Constitution.