FILED

10/15/2025

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 24-0328

DA 24-0328

IN THE SUPREME COURT OF THE STATE OF MONTANA

2025 MT 237

EQT CHAP LLC,

      Appellant,

  v.

ENVIRONMENTAL HEALTH SCIENCES,

      Appellee.

APPEAL FROM:   District Court of the Eighteenth Judicial District,
In and For the County of Gallatin, Cause No. DV-23-886
Honorable Rienne H. McElyea, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

      Murry Warhank. (argued), Jackson, Murdo & Grant, P.C., Helena,
Montana

      For Appellee:

      Peter Michael Meloy, Meloy Law Firm, Helena, Montana

      Michael Berry (argued), Ballard Spahr LLP, Philadelphia,
Pennsylvania

Argued: February 26, 2025
Submitted: July 9, 2025
Decided: October 15, 2025

Filed:

_____
Clerk

Justice Laurie McKinnon delivered the Opinion of the Court.

¶1     EQT CHAP LLC ("EQT") appeals the February 28, 2024 Order Re Motion to Quash Subpoena ("Order") of the Eighteenth Judicial District Court, Gallatin County.[1] The District Court granted Environmental Health Sciences' ("EHS") Motion to Quash the Subpoena served on it by EQT. The District Court concluded that Montana's Media Confidentiality Act ("Montana's Act") applied to the subpoenaed records, thereby making them absolutely privileged and not subject to disclosure. We reverse and remand for further proceedings.

¶2     We restate the issue on appeal as follows:

*Did the District Court err in concluding that Montana's Act, not Pennsylvania's privilege law, governs the subpoenaed records, which arose from reporting that occurred in Pennsylvania?*

**FACTUAL AND PROCEDURAL BACKGROUND**

¶3     In April 2022, Bryan Latkanich ("Latkanich") requested that the Pennsylvania Department of Environmental Protection investigate the alleged contamination of his Pennsylvania property's water, air, and soil. Kristina Marusic is an employee of EHS who lives in Pennsylvania. She conducted a study on the effects of fracking and collected air, water, and urine samples from the Latkaniches and their Pennsylvania property in 2019. The communications and sampling performed by Ms. Marusic influenced a four-part news

---

[1] On January 21, 2025, this Court entered an order modifying the caption of the case to accurately reflect the alignment of the parties to this appeal. The accurate caption is reflected here.

series titled "Fractured," which was published by the reporting arm of EHS.[2]  The series focused on pollution from fracking operations and the effects on local Pennsylvanians, including the Latkanich family.

¶4    After receiving an unfavorable determination letter from the Pennsylvania Department of Environmental Protection, Latkanich appealed to the Pennsylvania Environmental Hearing Board.  EQT was involved in the appeal because of its connection to fracking operations on the Latkanich property.  The Environmental Hearing Board issued a subpoena to EHS that contained EQT's various requests for production seeking documents related to Ms. Marusic's sampling, reporting, and communications.  EHS is headquartered in Bozeman, Montana.  Although the CEO of EHS, Douglas Fischer, works out of Bozeman, EHS's journalists work remotely from various states.  In October 2023, the subpoena was domesticated in Montana and served on EHS.

¶5    In November 2023, EHS moved to quash the subpoena and argued that all information sought was absolutely privileged under Montana's Act.  EQT responded that the sought information was not privileged because under Montana's conflict-of-laws rule, Pennsylvania's privilege law applied to the subpoena.  The District Court found that Ms. Marusic was based out of Pennsylvania and that the subpoenaed communications, research, and work product all occurred in Pennsylvania.  Yet, it concluded that although Pennsylvania has the most significant relationship to the communications, Montana law

_____

[2] The reporting arm of EHS is called *Environmental Health News*.  We use EHS and *Environmental Health News* interchangeably.

3

should still apply under the Restatement (Second) of Conflict of Laws § 139. The District Court granted EHS's Motion to Quash.

¶6 After we issued our decision in *Goguen v. NYP Holdings, Inc.*, 2024 MT 47, 415 Mont. 356, 544 P.3d 868, EQT moved for relief from the Order pursuant to Rule 60(b)(6). The District Court denied EQT's motion and reasoned that its Order was consistent with our analysis and approach in *Goguen*. The current appeal ensued, and this Court heard oral argument from the parties on February 26, 2025. On May 5, 2025, the parties jointly notified this Court that Latkanich had withdrawn his appeal in front of the Pennsylvania Environmental Hearing Board. Latkanich had also brought a civil action against EQT in Pennsylvania state court, but discovery in the civil action was stayed when the original subpoena was issued in the Environmental Hearing Board proceeding. Since the original subpoena was issued only in the Environmental Hearing Board proceeding, and not the civil action, we dismissed the case as moot and reasoned that no relief could be granted regarding a subpoena issued in a proceeding that no longer exists. However, we were made aware that an identical subpoena had been filed in the Pennsylvania civil action and domesticated in Montana on May 21, 2025. We subsequently granted EHS's Unopposed Petition for Rehearing and submitted the matter for decision without further briefing or argument.

**STANDARD OF REVIEW**

¶7 We review decisions on choice of law de novo. *Buckles v. BH Flowtest, Inc.*, 2020 MT 291, ¶ 8, 402 Mont. 145, 476 P.3d 422. We review a district court's findings of fact for clear error. *Buckles*, ¶ 8.

4

## DISCUSSION

¶8 *Did the District Court err in concluding that Montana's Act, not Pennsylvania's privilege law, governs the subpoenaed records, which arose from reporting that occurred in Pennsylvania?*

¶9 In Montana, the first step in a choice-of-law analysis requires determining whether an actual conflict exists. *Goguen*, ¶ 21. "[I]f the laws and interests of the concerned states are not in conflict, the result is deemed a false conflict or no conflict at all." *Goguen*, ¶ 21 (internal quotations omitted; citation omitted). An actual conflict only exists where choosing one state's law over the other will determine the outcome of the case. *Goguen*, ¶ 21. A false conflict exists if "application of either state's laws 'are substantially the same and would produce the same results.'" *Goguen*, ¶ 21 (quoting *Mowrer v. Eddie*, 1999 MT 73, ¶ 27, 294 Mont. 35, 979 P.2d 156). If no actual conflict exists, the law of the forum state applies, and no additional analysis is necessary. *Goguen*, ¶ 21.

¶10 Here, we must analyze Montana's Act against the Pennsylvania Shield Law and the qualified reporter's privilege under the First Amendment to the U.S. Constitution, which Pennsylvania also applies. Montana's Act states:

> Without a person's consent, a person, including any newspaper, magazine, press association, news agency, news service, radio station, television station, or community antenna television service or any person connected with or employed by any of these for the purpose of gathering, writing, editing, or disseminating news, may not be examined as to or may not be required to disclose any information obtained or prepared or the source of that information in any legal proceeding if the information was gathered, received, or processed in the course of the person's employment or business.

Section 26-1-902(1), MCA. Montana's Act, thus, provides broad protection for news agencies, like EHS. It protects all information from disclosure, including documents and

5

persons, and the sources of that information, whether confidential or not. The parties do not dispute, and we agree, that if Montana's Act applies to the subpoenaed records, EHS may assert the broad privilege thereunder and justifiably withhold the documents sought by EQT.

¶11 In contrast, Pennsylvania's protections are qualified and narrower. Pennsylvania's Shield Law states:

> No person engaged on, connected with, or employed by any newspaper of general circulation or any press association or any radio or television station, or any magazine of general circulation, for the purpose of gathering, procuring, compiling, editing or publishing news, shall be required to disclose the *source* of any information procured or obtained by such person, in any legal proceeding, trial or investigation before any government unit.

42 Pa. Cons. Stat. § 5942(a) (2025) (emphasis added). While Montana's Act broadly protects any information gathered in the course of the news agency's business, the Pennsylvania Shield Law only protects the *source* of the information. 42 Pa. Cons. Stat. § 5942(a); *Commonwealth v. Bowden*, 838 A.2d 740, 752 (Pa. 2003) (explaining that the Pennsylvania Shield Law protects documents but only to the extent those documents "could breach the confidentiality of the identity of a human source"). Pennsylvania's Shield Law has consistently been recognized as an absolute protection of the source's identity from compelled disclosure. *Castellani v. Scranton Times, L.P.*, 956 A.2d 937, 950 (Pa. 2008). The Shield Law, however, only applies to confidential sources who are persons. The statute states "that no person in a newsgathering enterprise 'shall be required to disclose the source of any information procured or obtained,'. . . which plainly presupposes a confidential source." *Bowden*, 838 A.2d at 748 n.6 (emphasis omitted; citing

6

42 Pa. Cons. Stat. § 5942(a)). The court found it significant that the statute is entitled "*Confidential* communications to news reporters." *Bowden*, 838 A.2d at 748 n.6 (emphasis altered; internal quotations omitted; citing 42 Pa. Cons. Stat. § 5942(a)). In *Bowden*, the Supreme Court of Pennsylvania explained that "documents may be considered sources for Shield Law purposes, but only where production of such documents, even if redacted, could breach the confidentiality of the identity of a human source and thereby threaten the free flow of information from confidential informants to the media." *Bowden*, 838 A.2d at 752 (citing *Davis v. Glanton*, 705 A.2d 879, 882, 885 (Pa. Super. Ct. 1997)). Further, "[t]he obvious purpose of the Shield Law is to maintain a free flow of information to members of the news media." *Hatchard v. Westinghouse Broadcasting Co.*, 532 A.2d 346, 350 (Pa. 1987). Thus, Pennsylvania's Shield Law was enacted to protect the free flow of information to the news media in their role as information providers to the general public. In *Hatchard*, the court saw "no apparent reason why the objective of promoting the free flow of information to the media would be defeated so long as any documentary information that could lead to the discovery of the identity of a confidential informant is shielded from disclosure." *Hatchard*, 532 A.2d at 350.

¶12    In 1991, Pennsylvania incorporated into its constitutional common law a second privilege. In *McMenamin v. Tartaglione*, the Commonwealth Court of Pennsylvania, noting that it was error for the trial court to have applied the Shield Law to a non-confidential source, applied the qualified reporter's privilege, which arises out of the United States Supreme Court's decision in *Branzburg v. Hayes*, 408 U.S. 665, 92 S. Ct. 2646 (1972). *McMenamin v. Tartaglione*, 590 A.2d 802, 811 (Pa. Commw. Ct. 1991);

7

*Bowden*, 838 A.2d at 753 n.10. *McMenamin* was affirmed by the Supreme Court of Pennsylvania, and a more comprehensive analysis was thereafter applied in *Bowden*, noting that *McMenamin* had already applied the qualified reporter's privilege. *McMenamin v. Tartaglione*, 590 A.2d 753 (Pa. 1991); *Bowden*, 838 A.2d at 753-55. The *Bowden* court explained that the United States Court of Appeals for the Third Circuit had indicated a majority of the *Branzburg* Justices "supported some quantum of privilege for reporters" under the First Amendment. *Bowden*, 838 A.2d at 752. Thus, after acknowledging the Third Circuit's recognition of a qualified reporter's privilege in *Riley v. City of Chester,* 612 F.2d 708 (3d Cir. 1979), *United States v. Cuthbertson*, 630 F.2d 139 (3d Cir. 1980), and *United States v. Criden*, 633 F.2d 346, 358-59 (3d Cir. 1980), Pennsylvania also recognized the Third Circuit's approach to the qualified reporter's privilege arising out of the First Amendment to the U.S. Constitution. *Bowden*, 838 A.2d at 752-60.

¶13    The Third Circuit's qualified reporter's privilege recognizes "that reporters have a qualified right to refuse to disclose their sources and materials." *Bowden*, 838 A.2d at 752 (citing a series of Third Circuit cases discussing the privilege). A party seeking to overcome the privilege must satisfy a three-part test.[3] *Bowden*, 838 A.2d at 755. First, the party must show that it has made an effort to obtain the information from other sources. *Bowden*, 838 A.2d at 755. Second, the party must demonstrate that the only way to access the information is through the journalist and the journalist's sources. *Bowden*, 838 A.2d at 755. Third, the party must persuade the court that the information is crucial to the claim.

---

[3] Since the District Court concluded that Montana law applied, it made no findings of fact regarding this three-part test.

8

*Bowden*, 838 A.2d at 755. However, this three-part test is not rigidly applied, differs from case to case, and "those asserting the privilege must overcome the well-settled principle that evidentiary privileges are not favored in litigation because they 'are in derogation of the search for truth.'" *Bowden*, 838 A.2d at 754 (quoting *Criden*, 633 F.2d at 358). Thus, Pennsylvania only protects records to the extent they would reveal a confidential source of the information but recognizes other discretionary and flexible protections based on the Third Circuit's approach to the uncodified qualified reporter's privilege. Here, whereas Montana's Act would clearly protect the subpoenaed records from disclosure, Pennsylvania's privilege law would provide an avenue for disclosure. Consequently, Montana's privilege law and Pennsylvania's privilege law are not substantially the same and the respective applications of each may not produce the same results. Therefore, we conclude that an actual conflict of laws exists.[4]

¶14 Next, as Montana has no statutory directive on choice of law related to this privilege question, we consider the Restatement (Second) of Conflict of Laws § 6 factors:

> (a) the needs of the interstate and international systems,
> (b) the relevant policies of the forum,
> (c) the relevant policies of other interested states and the relative interests
>     of those states in the determination of the particular issue,
> (d) the protection of justified expectations,
> (e) the basic policies underlying the particular field of law,
> (f) certainty, predictability and uniformity of result, and

---

[4] On remand, the District Court must apply Pennsylvania law to determine whether some or all of the subpoenaed records are privileged. Since the District Court made no findings of fact related to the qualified reporter's privilege, it is unclear if Pennsylvania definitively does or does not protect the subpoenaed records. Even if the District Court concludes that the subpoenaed records are protected from disclosure under Pennsylvania law (thus, reaching the same result Montana's Act provides), for purposes of this appeal, we conclude that an actual conflict sufficiently exists between Montana's Act and Pennsylvania's privilege law such that we can proceed with a full conflict-of-laws analysis.

(g) ease in the determination and application of the law to be applied.

Restatement (Second) of Conflict of Laws § 6(2) (1971) [hereinafter "Restatement (Second)"].

¶15    The analysis under the first factor "should seek to further harmonious relations between states and to facilitate commercial intercourse between them."   Restatement (Second) § 6 cmt. d.   Section 6(2)(a) "does not lean towards the importance of any particular state's law, but rather 'fosters harmonious relationships between states by respecting the substantive law [. . .] of a particular issue litigated in a foreign jurisdiction.'" *Goguen*, ¶ 24 (quoting *Phillips v. GMC*, 2000 MT 55, ¶ 35, 298 Mont. 438, 995 P.2d 1002). This first factor supports the application of the law of the state with the most significant relationship to the issue. *Goguen*, ¶ 24; *Phillips*, ¶ 35; *Buckles*, ¶ 23.  As we will further explain *infra*, the District Court properly determined that Pennsylvania has the most significant relationship to the issue: Montana is far removed from the substantive contest in Pennsylvania; the underlying dispute will be adjudicated and the remedy imposed in Pennsylvania; and the subpoena concerns documents regarding newsgathering that centered in Pennsylvania.  If we allow a Montana-based news organization, such as EHS, to shield itself behind Montana's Act and protect newsgathering that occurred in a foreign state, we undermine that foreign state's ability to allow its privilege laws to control the substance of adjudications and remedies within its own borders.  Applying Pennsylvania law here would undoubtedly promote harmonious relationships between Pennsylvania and Montana.  Consequently, this first factor favors application of Pennsylvania's privilege law.

¶16    The second factor considers the relevant policies of the forum.   Restatement (Second) § 6(2)(b).   The third factor considers "the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue." Restatement (Second) § 6(2)(c).   Both factors analyze "whether applying the law of a state would further the intended purpose of that law."   *Goguen*, ¶ 25 (citing *Phillips*, ¶ 37; Restatement (Second) § 6 cmt. e).   The relevant inquiry is "which state has the most significant interest for the particular issue."   *Goguen*, ¶ 25 (citation omitted).   In *Goguen*, it was important to our analysis to define the precise conflict-of-laws issue: we emphasized that the issue was which state's law applied to the fair report privilege, which was distinct from the question of which state's law applied to the underlying defamation claim. *Goguen*, ¶ 20.   Defining the issue remains key to choice-of-law analyses.   There is no dispute that the underlying civil claims between Latkanich and the defendants, including EQT, will be adjudicated in Pennsylvania pursuant to Pennsylvania law.   The relevant issue here is which state's privilege law should apply to a subpoena lodged against a third-party news agency headquartered in Montana when that subpoena relates to documents concerning newsgathering that occurred in Pennsylvania.

¶17    Before considering how each state's relevant policy relates to the precise issue we have defined, we first outline each state's policy as we did in *Goguen*.  *Goguen*, ¶¶ 26-27. The Supreme Court of Pennsylvania has stated that "[t]he obvious purpose of the Shield Law is to maintain a free flow of information to members of the news media" by protecting information that could lead to the discovery of a confidential informant.  *Bowden*, 838 A.2d at 750.   If disclosure of the information does not threaten the anonymity of confidential

11

sources, Pennsylvania supports disclosure of that information, except to the extent the qualified reporter's privilege applies and the requisite demonstration of need has been made to support disclosure. *See Bowden*, 838 A.2d at 752; *Hatchard*, 532 A.2d at 350 (explaining that the purpose of the Pennsylvania Shield Law is not furthered by protecting from discovery information in the possession of the media where disclosure would not reveal a confidential source). The Supreme Court of Pennsylvania has held that the qualified reporter's privilege under the First Amendment likewise parallels the policy underlying Pennsylvania's Shield Law. *See Bowden*, 838 A.2d at 753-54. As noted above, Pennsylvania follows the Third Circuit approach and recognizes the principle that evidentiary privileges restricting discovery are not favored in litigation. *Bowden*, 838 A.2d at 754. Pennsylvania adheres to the principle that "it is important for courts faced with privilege questions to consider whether a reporter's source is confidential, because the lack of a confidential source is a factor that favors production." *Bowden*, 838 A.2d at 754 (citation omitted); *see Criden*, 633 F.2d at 355-56 (explaining that the need for confidentiality is the basis for the privilege). Protecting the confidential source is the purpose behind Pennsylvania's privilege related to news agencies, but Pennsylvania still provides a limited exception for those situations where the litigant has demonstrated the information cannot be obtained from another source and the information is crucial to the litigant's claim.

¶18 The policy behind Montana's Act differs. Since its original enactment in 1943, Montana's Act has undergone various amendments. Montana's Act "was written to encourage a free and dynamic press by protecting journalists and related media personnel

12

from compelled disclosure of sources and confidential information." *Sible v. Lee Enters.*, 224 Mont. 163, 171-72, 729 P.2d 1271, 1276 (1986) (Hunt, J., concurring). Montana's Act explicitly shields a news agency and its reporters from being "required to disclose *any information* obtained or prepared or the source of that information in any legal proceeding if the information was gathered, received, or processed in the course of the person's employment or business." Section 26-1-902(1), MCA (emphasis added). Therefore, while Pennsylvania's policy is to primarily protect confidential sources, Montana's policy is to shield all information related to newsgathering from compelled disclosure. There are no exceptions under Montana's Act to allow disclosure based on the qualified reporter's privilege.

¶19     The District Court focused its analysis of the second and third factors on which state's law has objectively *stronger protections related to newsgathering*. It concluded that the second and third factors weigh in favor of applying Montana law because Montana's protection for a reporter's research is broader and stronger. The District Court's analysis advances the following approach: when the conflict-of-laws question focuses on which state's privilege law applies, the second and third factors weigh in favor of the state that has the broadest protection for the person or organization asserting the privilege. This approach is incorrect because it is detached from the facts of the case. If the District Court's reasoning were to stand, then it would not matter where the conduct occurred: all that matters would be which of the two states has the objectively stronger protections in place. This ignores Pennsylvania's adoption of federal constitutional common law recognized by the Third Circuit that ensures, upon proper showing, crucially necessary information

13

unobtainable from another source should be disclosed. Pennsylvania's policy underlying its two privileges is not *less* important than Montana's broad prohibition against any disclosure. Pennsylvania has a Shield Law that distinguishes between confidential and non-confidential sources, and people and documents. Pennsylvania also has a qualified reporter's privilege adopted by the Supreme Court of Pennsylvania following federal Third Circuit precedent. At best, all that can be said is that Pennsylvania's policy is *different* from Montana's policy—not that Pennsylvania is less interested in policies pertaining to newsgathering and balancing competing demands and interests surrounding dissemination of information. Since a conflict-of-laws analysis is fact-intensive, the analysis must be tethered to the specific facts involved and not simply a discussion of how strong each privilege is. *Buckles*, ¶ 11 (explaining "'that any analysis under the Restatement approach is necessarily driven by the unique facts, issues, applicable law, and jurisdictions implicated in a particular case'" (quoting *Talbot v. WMK-Davis, LLC*, 2016 MT 247, ¶ 23, 385 Mont. 109, 380 P.3d 823)). The relevant inquiry focuses on which state has the stronger policy interest in having its laws *applied to the precise issue* involved, and the precise issue involved here is which state's privilege law should apply to newsgathering that occurred in Pennsylvania. "[I]t is fitting that the state whose interests are most deeply affected should have its local law applied." Restatement (Second) § 6 cmt. f.

¶20 Both parties assert that *Goguen* supports their respective positions. *Goguen* involved a New York news agency and a New York reporter, but the facts here involve a Montana-based news agency and a Pennsylvania reporter. EHS highlights this difference and contends that *Goguen* is consistent with its opinion that the factors weigh in favor of

14

applying Montana law, namely because Montana has a stronger interest in having its privilege laws applied to a Montana-based news organization—EHS—just as New York had the stronger interest in having its privilege laws applied to the fair report privilege asserted by the *New York Post*. In contrast, EQT highlights that our central analysis in *Goguen* focused on where the conduct occurred and that here, the conduct occurred in Pennsylvania. We agree with EQT's position. The key inquiry is where the communication occurred, rather than where the headquarters of the news organization lies.

¶21 In *Goguen*, we concluded that New York had the stronger interest in having its laws applied to the fair report privilege, although the underlying defamation dispute centered in Montana. *Goguen*, ¶ 27. We reached this conclusion in large part because the conduct occurred in New York. *Goguen*, ¶ 27. Importantly, we noted that "[t]he conduct in question occurred in New York, and New York has the more significant interest in regulating the conduct of its citizens . . . . While conduct in New York may impact residents of other states, the conduct nonetheless took place in New York." *Goguen*, ¶ 27. We stated that "'New York's interest in fixing the scope of a privilege applicable to conduct taking place within its borders is paramount.'" *Goguen*, ¶ 26 (quoting *Wilkow v. Forbes, Inc.*, 2000 U.S. Dist. LEXIS 6587 at *20 (N.D. Ill. May 12, 2000)). Similarly, here, Pennsylvania's interest in fixing the scope of a privilege applicable to conduct taking place within Pennsylvania's borders is paramount.

¶22 The subpoenaed records relate to newsgathering that occurred in Pennsylvania—not Montana. The District Court found that Ms. Marusic, a reporter of EHS based out of Pennsylvania, collected various samples from the Latkanich property located in

15

Pennsylvania and from the Latkaniches themselves. Ms. Marusic's work involved communications she had in Pennsylvania. Her research and work product, including the communications being subpoenaed, occurred in Pennsylvania. While the District Court found that EHS is headquartered in Bozeman, Montana, it made no other factual findings connecting the reporting to Montana.

¶23 If we were to conclude that the second and third factors favored Montana law, we would be relying on a singular Montana connection—EHS's headquarters—as justification, while ignoring where the newsgathering occurred. It is only natural that the state wherein the newsgathering and communications occurred is the state that has the most significant policy interest in regulating whether the documents arising from the newsgathering and communications are privileged or not. The headquarters of the organization overseeing and disseminating the article is not controlling.[5] Allowing a Montana-based news organization to hide behind the location of its headquarters would impede the free flow of information that Pennsylvania policy favors, which is an unacceptable conclusion given the fact that the conduct occurred in Pennsylvania and involved a Pennsylvania-based reporter, Pennsylvania residents, and Pennsylvania property. The second and third factors favor the application of Pennsylvania law.

¶24 The fourth factor considers "the protection of justified expectations." Restatement (Second) § 6(2)(d). "Generally speaking, it would be unfair and improper to hold a person

---

[5] The parties dispute whether EHS was domiciled in Montana or elsewhere at the time the "Fractured" series was published. Because EHS's domicile does not guide our analysis of the second and third factors, it is irrelevant where EHS was in fact domiciled at the time of publication.

16

liable under the local law of one state when he had justifiably molded his conduct to conform to the requirements of another state." Restatement (Second) § 6 cmt. g. Even assuming EHS would have some justifiable expectation that Montana privilege law would apply because EHS is headquartered in Montana, this ignores where the communications were made and where the underlying facts about which the communications were made occurred. EQT has a justifiable expectation that Pennsylvania privilege law would apply to a subpoena issued in connection with an ongoing suit in Pennsylvania, about Pennsylvanians and their health and property, in which EQT is a defendant. This factor weighs in favor of applying Pennsylvania law.

¶25 The fifth factor considers "the basic policies underlying the particular field of law." Restatement (Second) § 6(2)(e). In *Goguen*, we concluded that when there is a major difference between the states' laws, the fifth factor is inapplicable. *Goguen*, ¶ 29; *see Phillips*, ¶ 66; *Buckles*, ¶ 29. There, the difference between New York law and Montana law was not minor because New York's fair report privilege was absolute, and Montana's privilege was qualified. *Goguen*, ¶ 29. Similarly, here, Montana's Act provides absolute protection to news agencies while Pennsylvania's law only provides a qualified reporter's privilege. Therefore, the fifth factor is inapplicable.

¶26 The sixth factor considers "certainty, predictability and uniformity of result." Restatement (Second) § 6(2)(f). EHS argues that this factor favors Montana law since EHS is headquartered in Montana and has reporters in multiple different states. It contends that certainty, predictability, and uniformity of result would be furthered if EHS could know for certain that Montana privilege law would apply to all subpoenas issued against it or its

17

reporters regardless of whether the subpoena was issued in relation to out-of-state conduct. While we acknowledge that this approach would create certainty and predictability for EHS, this approach fails to consider that the foreign litigant subpoenaing an EHS reporter for information related to conduct that occurred in a foreign state would be required to determine the domicile of EHS only to then realize that the information sought is privileged by Montana law. Instead, certainty, predictability, and uniformity of result is furthered when news organizations and reporters can expect that the privilege law of the state where the reporting occurred governs. Litigants would also be more confident that the applicable law is the privilege law of the state with the most nexus to the conduct involved in the litigation. We conclude that the sixth factor favors Pennsylvania law.

¶27 The seventh and final factor considers "ease in the determination and application of the law to be applied." Restatement (Second) § 6(2)(g). "Ideally, choice-of-law rules should be simple and easy to apply. This policy should not be overemphasized, since it is obviously of greater importance that choice-of-law rules lead to desirable results. The policy does, however, provide a goal for which to strive." Restatement (Second) § 6 cmt. j. In *Goguen*, we focused on the difficulty in determining and applying each state's law. *Goguen*, ¶ 31. Here, the seventh factor regarding "ease in the determination" of the law favors Pennsylvania law because it is easier to identify which privilege law applies by identifying where the reporting occurred. However, the application of Pennsylvania law is more difficult than the application of Montana law because Montana's privilege is absolute while Pennsylvania's law requires considering the three-part test under the qualified reporter's privilege. Consequently, we conclude that the seventh factor weighs equally.

18

¶28     The District Court found that the reporter is based out of Pennsylvania, the communications she made that address the underlying Pennsylvania matter occurred in Pennsylvania, the reporter's work product and research was done in Pennsylvania, and the communications being subpoenaed occurred in Pennsylvania. The District Court found that Montana was far removed from the underlying substantive adjudication, and "[t]he most significant relationship to the communication supports a conclusion that Pennsylvania law must apply." The District Court was correct in its findings of fact; however, in reaching its conclusions of law, it misapplied the § 6 factors. Applying the § 6 factors, we conclude that the District Court erred by holding that Montana law applies. Pennsylvania's privilege law applies to the subpoena.

¶29     The Restatement (Second) of Conflict of Laws also contains various sections that provide rules specific to certain areas of the law. In the past, we have applied the specific section related to torts, to conflict-of-laws questions. *See Goguen*, ¶¶ 32-38; *Buckles*, ¶¶ 18-21. Section 145(1) provides that "[t]he rights and liabilities of the parties *with respect to an issue in tort* are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6." Restatement (Second) § 145(1) (emphasis added). In *Goguen*, application of § 145 was appropriate because we dealt with an issue in tort—whether the fair report privilege applied as a tort defense or as absolute immunity from tort liability. *See Goguen*, ¶ 22. In *Buckles*, application of § 145 was appropriate because we considered which state's substantive law applied to a wrongful death claim. *See Buckles*, ¶ 1. However, § 145 is not applicable here because we are not considering an issue in tort. As

19

explained above, the issue is which state's privilege law should apply to a subpoena—an issue better characterized as a discovery dispute rather than an issue in tort. Thus, we need not apply § 145 here.

¶30 Finally, EHS argues, and the District Court applied, § 139, which is the specific rule in the Restatement (Second) that governs privileged communications. Importantly, we have never adopted § 139 of the Restatement (Second) and find it unnecessary to do so here because the application of the § 6 factors resolves the dispute. However, because the District Court's reasoning was premised upon § 139, we will briefly address it here. Section 139 provides:

> (1) Evidence that is not privileged under the local law of the state which has the most significant relationship with the communication will be admitted, even though it would be privileged under the local law of the forum, unless the admission of such evidence would be contrary to the strong public policy of the forum.
> (2) Evidence that is privileged under the local law of the state which has the most significant relationship with the communication but which is not privileged under the local law of the forum will be admitted unless there is some special reason why the forum policy favoring admission should not be given effect.

Restatement (Second) § 139.

¶31 We need not decide under the Restatement or precedent which state would be considered the "forum" when the underlying controversy is in one state, but domestication of the subpoena is in another state requiring the application of a conflict-of-laws analysis. If we conclude § 139 implies that the "forum" is the state of the underlying litigation, then the "forum" would be Pennsylvania. We have already concluded that Pennsylvania is the state with the most significant relationship to the communications. Since § 139 calls for

20

situations where the "forum" and the state with the most significant relationship reach different outcomes regarding whether the communications are privileged, if Pennsylvania is both the "forum" and the state with the most significant relationship, then there is no difference in outcome. Thus, if Pennsylvania is considered the "forum," Pennsylvania law is still favored.

¶32 If we conclude "forum" to mean Montana, the location of this present dispute, then a situation exists where arguably we can apply § 139(1). The communications potentially would not be considered privileged under the law of the state with the most significant relationship, Pennsylvania, but would be privileged under the law of the "forum," Montana. Section 139(1) states that in such a case, the communications will be admitted, unless the admission would be contrary to the strong public policy of Montana, the "forum." As discussed above, Montana does not have a strong public policy interest in having its privilege law applied to reporting that occurred in Pennsylvania. Therefore, even if we construe Montana as the "forum," we are left with the same result that the application of Pennsylvania's privilege law is favored.

## CONCLUSION

¶33 While we find no clear error in the District Court's factual findings, the District Court erred by determining that Montana's Act applied to the subpoena. After considering the § 6 factors, we conclude that Pennsylvania's privilege law applies. On remand, the District Court must apply the Pennsylvania Shield Law and the qualified reporter's privilege to the subpoena and determine whether all or some of the documents sought are privileged under Pennsylvania law.

21

¶34    Reversed and remanded.


                                   /S/ LAURIE McKINNON

We Concur:

/S/ CORY J. SWANSON
/S/ JAMES JEREMIAH SHEA
/S/ BETH BAKER
/S/ KATHERINE M. BIDEGARAY
/S/ INGRID GUSTAFSON
/S/ JIM RICE